RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0309p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
　　　　　　　　　　*Plaintiff-Appellee*,

　*v.*

DARIN LEE MCALLISTER,
　　　　　　　　　　*Defendant-Appellant.*

No. 11-5932

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cr-138-1—John T. Nixon, District Judge.

Argued: June 5, 2012

Decided and Filed: September 6, 2012

Before: KEITH, McKEAGUE, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Daniel D. Warlick, Nashville, Tennessee, for Appellant. Steven S. Neff, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Daniel D. Warlick, Benjamin C. Mezer, Nashville, Tennessee, for Appellant. Steven S. Neff, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

　　　KEITH, J., delivered the opinion of the court in which DONALD, J., joined, and McKEAGUE, J., joined in part. McKEAGUE, J. (pp. 19–22), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

　　　DAMON J. KEITH, Circuit Judge. Defendant-Appellant Darin Lee McAllister appeals his jury conviction of fifteen counts of wire fraud and three counts of bankruptcy fraud. McAllister, a former FBI agent, was convicted after fraudulently making material

1

misrepresentations on loan documents to obtain real estate loans for rental properties, and making material misrepresentations on official documents during bankruptcy proceedings. At trial, McAllister raised a *Batson* challenge to the Government's peremptory strike of the only two African-Americans in the petit jury pool. At the district court's instruction, the Government offered race-neutral reasons for striking the jurors. The district court then summarily accepted those reasons, concluding the *Batson* analysis by stating, "All right." On appeal, McAllister argues that the district court erred in its treatment of his *Batson* claim. McAllister also claims the district court erred in excusing a defense witness from testifying after the witness notified the court of his intention to invoke the Fifth Amendment in response to all questions asked by the defense. Finally, McAllister argues that he was denied the right to a fair trial due to alleged judicial and prosecutorial misconduct, and that he received ineffective assistance of counsel. For the following reasons, we AFFIRM in part, and REMAND the case to the district court for further findings.

I.

On May 19, 2010, McAllister was charged with fifteen counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of bank fraud, in violation of 18 U.S.C. § 1344; and three counts of bankruptcy fraud, in violation of 18 U.S.C. § 151(3). During voir dire, the Government used peremptory challenges to strike the only two African-American prospective jurors—Jurors Willie Ewing and Jaminthia Pillow. The district court asked all prospective jurors about their employment status. Juror Ewing indicated to the court that he was unemployed. The following colloquy ensued between the prosecutor and Juror Ewing:

| | |
|---|---|
| AUSA: | Has anybody else ever worked at a bank? Anybody? |
| Juror Ewing: | Third Nashville. |
| AUSA: | And how long ago was that? |
| Juror Ewing: | [19]72, when I got out of the service. |
| AUSA: | Oh, okay. What branch of the service were you in? |
| Juror Ewing: | Military police. |
| AUSA: | Okay. And how long were you in the service? |
| Juror Ewing: | [19]68 to [19]72. |

> AUSA:          And did you have any law enforcement experience after that?
> Juror Ewing:   No.  Just security.
> AUSA:          Okay.  What did you do?  What do you mean by security?
> Juror Ewing:   I mean after I left the bank, I got into security with South Central Bell and two or three other security companies.
> AUSA:          Okay, Thank you.

The Government used its peremptory challenge to remove Juror Ewing from the jury.

When the Government questioned Juror Pillow, she revealed that she had a prior criminal conviction on charges of giving false information to law enforcement in the pursuit of an official investigation.  Shortly thereafter, the Government used a peremptory challenge to remove her.  Having had both African-Americans in the petit jury pool removed, the defense counsel immediately raised a *Batson* challenge, requesting that the Government "at least explain" its decision to strike Jurors Ewing and Pillow.  The district court responded that it was unnecessary for the Government to explain striking Pillow.

After the jury was impaneled, the district court held a hearing in response to defense counsel's *Batson* concerns.  The following is an excerpt from the hearing:

> Court:[AUSA Gary Humble], I am going to give you the opportunity to state your reasons for striking Willy Jerome Ewing . . . . There were two African American . . . potential jurors, and you struck both of them.
>
> In the case of Ms. Pillow, she stated that she had had a criminal conviction for an offense.
>
> I'm going to ask you to pay attention to what I'm saying, Mr. Humble.
>
> . . .
>
> In regard to Ms. Pillow, I don't think you need to make a statement because she stated that she had been convicted of a felony involving deception.  So I'm not going to ask you to explain that.
>
> . . .
>
> But in regard to [Willy Ewing], I'll ask you to explain your reasons for striking him.

AUSA Humble: Your Honor, the main reason is that he was unemployed. And I wanted to talk to [AUSA Steven Neff] to see what other reasons that we had. That's the first thing that came to my mind. [Conferred with Mr. Neff]

. . .

In addition to being unemployed, I have here in my notes that he was in the [Military Police] from [1968] to [1972]. And there was a concern that he would identify with the defendant.

Court: All right.

AUSA Humble: And I would also note for the record, although the record may be clear on this, that there was the initial group of jurors. And at that point when we made the strike, there was still one African American left in the pool.

Court: All right.

AUSA Humble: Thank you, Your Honor.

At trial, the evidence revealed that McAllister worked in Los Angeles as an FBI agent and moved to Tennessee in 2005 when he transferred to the FBI's Nashville office. McAllister purchased a home in Nashville valued at $1.5 million. His monthly mortgage payments were approximately $7,500, while his gross monthly income was $8,000. Approximately eighteen months after moving to Nashville, McAllister sought to obtain loans to purchase rental properties. A loan officer for SunTrust Bank, Wes English, processed McAllister's loan documents. At the closing, McAllister signed loan documents that contained several falsehoods. The forms falsely represented that McAllister was an entertainment company executive at "DOJ Productions" who earned $42,000 per month. In the loan application, the address for DOJ Productions was listed as the same address as the Department of Justice in Nashville. At McAllister's behest, his tax preparer sent a letter to the bank, indicating that McAllister had been self-employed in the music industry for the preceding two years—thereby satisfying the requirements for the type of loan McAllister sought. McAllister's defense theory was that English falsified the documents and that McAllister did not read the documents before signing them. SunTrust Bank granted McAllister fifteen loans and wired the

money to the escrow account of the attorney handling the closings for McAllister's real estate purchases.

McAllister also applied for a $100,000 unsecured line of credit from SunTrust Bank, which he obtained in July 2006.  In his application for the line of credit, McAllister falsely represented that he earned an annual salary of $500,000, and that he was the president of his wife's record company, Judah Records.

Because McAllister was unable to repay his loans, the bank foreclosed on some of his rental properties, and sold others in a short sale. McAllister filed for bankruptcy in July 2009.  The record reveals that McAllister made false representations during his bankruptcy proceedings.  In his Statement of Financial Affairs, McAllister falsely represented that he had no rental income, that he had no foreclosures, and that he had no property transfers (e.g., a short sale)—all falsehoods which proved to be material and formed the basis for his convictions for bankruptcy fraud.

A jury convicted McAllister of all counts of wire fraud and bankruptcy fraud, but did not reach a verdict on the bank fraud charge.[1]  McAllister was sentenced to 48 months of imprisonment and ordered to repay $775,142.83 in restitution.

II.

## 1. *Batson* **Challenge**

McAllister argues that the district court erred by denying his *Batson* challenge after the prosecutor struck the only two African-American prospective jurors.

This court "review[s] a district court's determination of a *Batson* challenge with great deference,' under a clearly erroneous standard." *United States v. Cecil*, 615 F.3d 678, 685 (6th Cir. 2010), *cert. denied*, 131 S.Ct. 1525 (2011); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*) ("In the context of direct review . . . the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." (internal quotation marks

---

[1]The bank fraud charge subsequently was dismissed without prejudice.

omitted)). "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El I*, 537 U.S. at 339-40. However, "deference does not imply abandonment or abdication of judicial review," for deference, by definition, does not preclude relief. *Id.* at 340.

The Equal Protection Clause does not entitle a defendant to a petit jury composed in whole or in part of his own race, *Batson v. Kentucky*, 476 U.S. 79, 85 (1986); however, it does guarantee "that the State will not exclude members of [the defendant's] race from the jury venire on account of race or on the false assumption that members of his race as a group are not qualified to serve as jurors," *id* at 86. In other words, the defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id.*

A *Batson* challenge entails three distinct and sequential steps: (1) the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race; (2) the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; (3) finally, the trial court must determine whether the opponent of the peremptory strike has proven purposeful discrimination. *Cecil*, 615 F.3d at 686; *Synder*, 552 U.S. at 476-77 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) (*Miller-El II*) (Thomas, J. dissenting)); *Hernandez v. New York*, 500 U.S. 352, 358-359 (1991) (plurality opinion). The three-step analysis thus places a burden on the opponent of the peremptory strike, the proponent of the peremptory strike, and the trial court. During step two, the burden of *production* shifts to the proponent of the peremptory strike; however, the burden of persuasion regarding racial motivation never shifts from the opponent of the strike. *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008); *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

To establish a prima facie case—and thus satisfy step one—the party challenging the peremptory strike must demonstrate that: (1) he is a member of a cognizable racial

group; (2) a peremptory challenge was employed to remove a juror of the defendant's race; and (3) these facts, along with other relevant circumstances, raise an inference that the proponent of the peremptory challenge used the challenge to exclude a prospective juror because of his or her race. *United States v. Odeneal*, 517 F.3d 406, 418-19 (6th Cir. 2008); *United Sates v. Ferguson*, 23 F.3d 135 (6th Cir. 1994).[2]   McAllister argues that he undisputedly established the first two elements of a prima facie case because he and both excluded jurors are African-American.

Striking both prospective African-American jurors raised the inference of racial discrimination, thus satisfying the third element of a prima facie case. After McAllister raised the *Batson* issue, the district court explained to the Government that it would "give [the Government] the opportunity to state [its] reasons for striking Willy Jerome Ewing," because, as the district court noted, the Government struck the only two African-American potential jurors.   The district court's comments indicate that McAllister's prima facie case was predicated on the Government striking both prospective African-American jurors. In the case of Juror Ewing, the district court was clearly convinced that McAllister had satisfied a prima facie case under *Batson* because it shifted the burden of production to the Government, requiring it to produce a race-neutral reason for the strike.[3]   The Government's argument to the contrary is unpersuasive. In any event, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue[] of whether the defendant has made a prima facie showing becomes moot." *Braxton v. Gansheimer*, 561 F.3d 453, 461 (6th Cir. 2009) (quoting *Hernandez*, 500 U.S. at 359).

---

[2]A defendant may also raise a *Batson* violation even if he or she is not of the same race as the excluded juror. *Powers v. Ohio*, 499 U.S. 400, 402 (1991).

[3]The Government invites us to interpret the district court's ultimate denial of McAllister's *Batson* challenge as evidence that McAllister did not meet the third element of a prima facie case of discrimination under *Batson*. This interpretation is plausible as it relates to Juror Pillow, but, as explained, not Juror Ewing. The district court clearly refused to proceed to the second step of the *Batson* analysis with regards to Juror Pillow, citing Juror Pillow's prior criminal conviction. We do not find clear error in the district court's implicit finding that McAllister failed to establish a prima facie case that the Government's peremptory strike of Juror Pillow was rooted in racial discrimination.

During the second step of the *Batson* challenge, the proponent of the strike must articulate a race-neutral explanation for striking the jurors in question. *Cecil*, 615 F.3d at 686; *Purkett*, 514 U.S. at 767. It is well settled that this explanation need not be particularly persuasive or plausible. *United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008); *United States v. Lucas*, 357 F.3d 599, 609 (6th Cir. 2004); *Purkett*, 514 U.S. at 767-68. At this step of the *Batson* inquiry, "unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 768. Here, the Government met its burden of production when it proffered Juror Ewing's unemployment and past employment in law enforcement as race-neutral reasons. Since racial discrimination is not inherent in either unemployment status or past employment in law enforcement, the Government's reasons are race-neutral for *Batson* purposes.

McAllister argues that the district court erred by perfunctorily accepting the Government's race-neutral reason and not engaging in the third step. At the third step of the *Batson* inquiry, the trial court has a duty to assess whether the opponent of the strike has met its burden to prove purposeful discrimination. *Hernandez*, 500 U.S. at 363. The judge must assess the plausibility of the proponent's race-neutral reason in light of all evidence with a bearing on it. *Miller-El II*, 545 U.S. at 251-52. We have held that the preceding command "places an affirmative duty on the district court to examine relevant evidence that is easily accessible." *Torres-Ramos*, 536 F.3d at 560. The trial judge must consult "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478. The trial court may neither "short circuit the [*Batson* analysis] by consolidating any two of the steps," *Kimbrel*, 532 F.3d at 466, nor "simply accept the prosecution's explanation on its face," *Torres-Ramos*, 536 F.3d at 559. Rather, the trial judge has a duty to determine whether purposeful discrimination has been established. *Id.* Here, the record reveals that after the district court heard the prosecutor's race-neutral explanation, it stated just two words on the record: "All right." Although vague in phrasing, "all right" was an implicit ruling against McAllister because the hearing immediately ended and the jury was already impaneled. From a

review of the record, it is unclear to what extent the district court engaged in the third step, if it did at all.

We have underscored both the importance of trial courts "explicitly adjudicat[ing] the credibility of the non-moving . . . party's race[-]neutral explanations," and "[t]he need for an explicit, on-the-record analysis of each of the elements of a *Batson* challenge." *McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521 (6th Cir. 2001) (internal quotations omitted). "Because the primary defense to pretext based violations of *Batson* is the district court's ability to assess the credibility of an attorney's representations, it is critical that the district court independently assess the proffered justification." *Id.*

In *United States v. Cecil*, the defendant similarly argued that the district court prematurely rejected his *Batson* challenge without engaging in the third step. 615 F.3d at 686 ("[A]s soon as the government proffered its race-neutral explanation for striking Carter—which was that her husband was a high-ranking officer of the [Metropolitan Nashville Police Department]—the district court stated, 'Based upon that information . . . the court is going to deny the defense *Batson* challenge to the panel.'"). Cecil's counsel requested to be heard and voiced several reasons why the government's explanation was unsatisfactory. The district court then denied the motion, reasoning that the prospective juror being married to an officer would increase the chance that she would recognize people who would testify or be the subject of testimony. We affirmed Cecil's conviction only after holding that the district court *ultimately* carried out the required analysis and made its own findings about the plausibility of the government's arguments. We reasoned that "if the district court had *actually* truncated the *Batson* analysis by mechanically accepting the government's explanation for striking Carter, it would have erred." *Id.* at 686 (emphasis added). We also observed that:

> *Batson* challenges are an important tool for ferreting out invidious discrimination, and, as such, they should not be glossed over with undue haste. Thus, when conducting the three-step *Batson* analysis, a court should take care to delineate each of the steps explicitly, reserving judgment on the challenge until all of the steps have been performed. Furthermore, at the third step of the *Batson* framework, a court should

take the time to *articulate thoroughly its findings* on the issue of purposeful discrimination.

*Id.* at 687 n.3 (emphasis added).

Similarly, in *McCurdy v. Montgomery County*, the plaintiff, James McCurdy, objected to the defendant's use of a peremptory challenge against an African-American woman. 240 F.3d at 520. In response, the defense counsel stated, "[I]n my view in watching [the prospective juror], there was no response to any of the questions, no nodding of the head. I just took it that she wasn't interested in the case . . ." *Id.* The district court overruled McCurdy's *Batson* objection "[w]ithout questioning [the prospective juror] or engaging in a colloquy with either [plaintiff's] or [defendant's] counsel." *Id.* The plaintiff renewed his *Batson* objection in a new trial motion. In rejecting the motion, the district court responded that the juror was "passive" in the face of the parties' questioning and that the defendant had therefore articulated a race-neutral justification. We concluded that the district court did not clearly err because it did not "merely credit the explanation of the County, but itself found that [the prospective juror] was passive and disinterested." *Id.* Like in *Cecil*, the district court ultimately conducted a constitutionally sufficient *Batson* analysis. We noted, however, that the district court's "initial reaction to McCurdy's *Batson* claim, in which it perfunctorily accepted the County's race-neutral explanation, did not conform to the requirements that the district court make expressed findings on each of the elements of a *Batson* claim." *Id.* at 521.

In this case, the district court improperly truncated the *Batson* analysis and failed to explicitly delineate each step. The district court did exactly what this court has repeatedly instructed against doing: perfunctorily accepting the prosecutor's race-neutral explanation and combining steps two and three. *McCurdy*, 240 F.3d at 521; *Cecil*, 615 F.3d at 686; *Torres-Ramos*, 536 F.3d at 559. The district court did not consult with the defense counsel to hear a response to the Government's race-neutral explanation, nor did it engage the prosecution to independently assess the plausibility of its argument. *See Miller-El II*, 545 U.S. at 251-52. Gauging from the district court's two-word analysis and finding— "all right"—it is doubtful that the district court consulted all circumstances that bear upon the issue of racial animosity. *Snyder*, 552 U.S. at 478. We

have no way of reviewing the district court's reasoning for rejecting McAllister's *Batson* challenge.  Thus, the district court did not conduct a constitutionally sufficient *Batson* analysis.

The district court's errors were not necessarily inconsequential.  Exploration into the Government's race-neutral explanation would have revealed, if not already apparent, that there were impaneled non-African-American jurors who expressed a similar, albeit not exact, employment status as Juror Ewing.  Juror Carolyn Goldtrap, for example, stated that she was an interim teacher, who "[hadn't] found a full-time job yet." Similarly, Juror Betty Goodowens stated that she "worked at home," but did not indicate the nature of her employment, if she was employed at all.

There was also an impaneled juror who had a background in law enforcement. Juror Heidi  Wallace-Langston, a retired Missouri Probation and Parole Officer for adult felony offenses, was impaneled as an alternate juror.  The Government mentioned that Juror Ewing's law enforcement background was concerning because he could  identify with the defendant.   Juror Wallace-Langston had a career in law enforcement—presumably longer than Juror Ewing's four-year "career" working with the Military Police—and yet the Government failed to exercise its permitted peremptory challenge against Wallace-Langston serving as an alternate juror.  *See* Fed. R. Crim. P. Rule 24(c)(2)(A), (c)(4)(A).  The different standards applied to Ewing and Wallace-Langston could have suggested that the Government feared that Ewing would relate to the defendant on account of race, not a nexus to law enforcement.  The former reason is premised on the impermissible assumption that a juror of the same race as the defendant cannot neutrally assess the facts and follow the law.  It is important to note that these facts, either independently or collectively, are not necessarily indicia of purposeful racial discrimination; however, the point remains that the record below indicates a failure on the part of the district court—being in the best position to make these determinations—to conduct a constitutionally sufficient *Batson* analysis, definitively resolving these issues.

The Government points out that, regardless of any procedural error that might have occurred, the defense did not request the opportunity to demonstrate that the

purported explanation was pretextual. We have held that once the proponent of the peremptory strike proffers a race-neutral explanation, the opposing party has the burden to rebut those reasons on the record. *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003). Failure to rebut race-neutral explanations or the district court's conclusion will result in a plain error review of the district court's conclusion. *Id.* However, failing to object to the race-neutral explanation does not preclude review, nor does it relieve the district court of its duty to independently assess all evidence with a bearing on racial discrimination.[4]

Here, there was no conclusion for McAllister to rebut because the district court gave no conclusion regarding the existence of purposeful racial discrimination. Had it been apparent that the district court actually engaged in the third step, then its determination would be afforded great deference by this court. But because the record is unclear as to whether the district court engaged in the third step of *Batson*, we REMAND the case to the district court to make explicit on-the-record findings as to whether McAllister established the existence of purposeful race discrimination in the selection of his jury, and whether his *Batson* challenge requires that his conviction be reversed. *See Torres-Ramos*, 536 F.3d at 560-61.[5] In making those findings, the district

---

[4]In some cases, failing to respond to the race-neutral explanation could indicate that the party challenging the peremptory strike no longer disputes the strike. *See Jackson*, 347 F.3d at 598. That was not the situation here. During oral argument, the Government indicated that McAllister's attorney "clearly intended to preserve" his *Batson* claim for the record and did not abandon the issue or accept the Government's explanation.

[5]The dissent seems to concede that the district court erred, but would affirm the district court under a plain error review. "Plain error" is a clear or obvious error that affects the defendant's substantial rights and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and citations omitted). The dissent would conclude that the district court's error did not adversely affect McAllister's substantial rights or seriously affect the fairness and integrity of the judicial proceedings. We disagree. Even a plain error review is no obstacle to relief in this case. *Batson* errors are structural errors that are not subject to harmless-error review. *Kimbrel*, 532 F.3d at 469 (citing *United States v. McFerron*, 163 F.3d 952, 955-56 (6th Cir. 1998)). When the error in question is structural, the defendant is not required to show that the putative error affected his substantial rights. *See United States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005). Moreover, *Batson* errors represent a violation of the right to equal protection of the laws, which itself does damage to the fairness, integrity, and public reputation of the judicial proceeding. As the Second Circuit observed:

> There is . . . usually little question that any *Batson* error we find would affect a defendant's substantial rights the violation of which would result in manifest injustice. . . . [S]ince no court can countenance a violation of the Equal Protection Clause of the Constitution[,] any such error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.

court must consider all evidence, including juror questionnaires, that bear on the issue of racial animosity.

**2. Wes English's Blanket Assertion of his Fifth Amendment privilege**

McAllister argues that the district court erred by excluding the testimony of Wes English, the SunTrust loan officer who drafted McAllister's loan documents. At a hearing out of the presence of the jury, English's counsel advised the court that English would "invoke his Fifth Amendment privilege with respect to any questions pertaining to his employment at SunTrust Bank and his relationship to Mr. McAllister." McAllister then requested permission to call English to the stand. The court responded, "Well, if you call him to the stand he's going to refuse to answer any questions other than his name." The district court then denied McAllister's request to call English to the stand, commenting that it would be absolutely improper. Although McAllister's brief does not assign a specific error, he seems to argue that the district court erred in refusing to let English take the stand.

We review a district court's decision whether to allow a witness to take the stand after being advised of his intention to invoke his Fifth Amendment privilege for an abuse of discretion. *United States v. Ballard*, 280 F. App'x 468, 470 (6th Cir. 2008) (unpublished decision). "The longstanding rule of this circuit is that a [witness] must take the stand and answer individualized questions in order to invoke his Fifth Amendment privilege." *United States v. Bates*, 552 F.3d 472, 475 (6th Cir. 2009) (citing *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983)). We have explained that before permitting a witness to assert a Fifth Amendment privilege, courts must determine if the witness has "reasonable cause" to apprehend a real danger of incrimination. *In re Morganroth*, 718 F.2d at 167. There is a presumption against blanket assertions of Fifth Amendment privilege because blanket assertions, generally, are not sufficient to meet this "reasonable cause" requirement. *Bates*, 552 F.3d 475-76. However, we have

---

*United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003) (internal quotation marks, citations, and parentheses omitted).

recognized that in instances where the witness has a clear entitlement to claim the privilege, forcing the witness to take the stand would be "futile and thus unnecessary." *Id.* (internal quotation marks omitted). "In such a case, the reason behind the rule does not apply because the court already knows that 'reasonable cause' to invoke the privilege exists." *Id.* at 476.

English had a clear entitlement to claim his Fifth Amendment privilege because the danger of incrimination was apparent. The defense counsel notified the district court that they intended to introduce evidence of an instance in which English allegedly forged another employee's name on a personnel document and an instance of bank fraud. The defense's theory was that English falsified information on McAllister's loan documents to facilitate the loan. The defense argued that English had abused the loan process, forged names, and ensured that clients did not know the information he was submitting on their behalf. It was apparent to the district court that defense counsel would question English about his involvement in processing McAllister's loan. English's answer to these questions could have likely subjected him to criminal prosecution. Accordingly, given that English's counsel advised the court that English would invoke the Fifth Amendment to every question pertaining to his employment and relationship with McAllister, the district court did not abuse its discretion in permitting English to make a blanket assertion of the privilege.

**3. Judicial Misconduct**

McAllister asserts that the district court's conduct throughout the trial denied him a fair trial. We generally review a district court's conduct during a trial for an abuse of discretion. *McMillian v. Castro*, 405 F.3d 405, 409 (6th Cir. 2005). However, "where the defendant does not contemporaneously object to the trial court's conduct, we review that conduct under the plain-error standard." *United States v. Hynes*, 467 F.3d 951, 958 (6th Cir. 2006). "A finding of plain error requires a defendant to show (1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010).

McAllister cites to numerous excerpts in the transcript, all of which fall far short of plain error, and none of which indicate an abuse of discretion. As an example of an abuse of discretion, McAllister claims that the district court interrupted a prosecutorial witness twenty-four times to ask its own questions that allegedly favored the prosecution. A review of the record reveals that the district court's questions and interruptions do not show hostility or bias, and were generally intended to clarify the witness's testimony.

Most significant, McAllister argues that the district court erred by not allowing the defense to introduce an audio recording of a bankruptcy hearing. He contends that the Rule of Completeness espoused in Federal Rule of Evidence 106 mandates its admissibility. Rule 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[6]

In ruling on a Rule 106 request to supplement a statement, the district court must determine "(1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will insure a fair and impartial understanding of all of the evidence." *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996) (internal quotation marks omitted).

McAllister reasons that since the Government called McAllister's bankruptcy attorney to testify that McAllister made certain omissions in his bankruptcy documents, the defense should have been able to use an audio recording of a separate hearing to "give[] the jury a more complete understanding of the defendant's state of mind." Appellant Br. at 28. We disagree. The Government did not introduce a writing related to the hearing or any portion of the audio recording. Rather, the Government had an attorney testify about an omission on McAllister's bankruptcy petition. McAllister

---

[6]Rule 106 was amended in 2011, but the changes were stylistic only.

sought to introduce an audio recording of the defendant admitting that he had taken some losses on income properties. The audio recording was made at a hearing conducted weeks after he filed his bankruptcy petition. Further, the statements in the audio recording did not contradict the information contained in the petition. We therefore conclude that the district court did not abuse its discretion in excluding the audio recording of the defendant's statements at the bankruptcy hearing.

### 4. Prosecutorial Misconduct

McAllister argues that the prosecutor engaged in misconduct which deprived him of his right to due process. The parties agree that there were no contemporaneous objections to the alleged prosecutorial misconduct, and we thus review for plain error. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). To assess prosecutorial misconduct, we first determine whether the prosecutor's conduct was improper, and if so, whether the improprieties were flagrant. *United States v. Tarwater*, 308 F.3d 494, 501 (6th Cir. 2002). "To determine flagrancy, we consider: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused." *Id.* at 511. McAllister claims that the prosecutor "struck many foul blows." Specifically, he claims the prosecutor: (1) used a witness's past work as an undercover FBI agent to undermine his credibility; (2) acted improperly by suggesting that a witness did not read the entirety of the documents he purported to rely on; and (3) misled the jury in closing arguments. We find no merit in McAllister's assertion that the Government's conduct deprived McAllister of due process. The Government's conduct, even if improper, did not rise to the level of flagrancy. Attacking the credibility of a former undercover agent by exposing the fact that undercover work requires them to lie, does not constitute flagrant conduct.

Similarly, we see no fault in the Government's suggestion that Dr. Gary Lacefield did not review the entirety of more than 14,000 pages of documents that he purportedly relied upon within the one-week time period for which he billed.

McAllister also highlights comments during closing argument that he contends demonstrate prosecutorial misconduct.  Specifically, McAllister cites to the following statement from the Government's closing argument that references McAllister's bankruptcy attorney:

> You know, when we met with Mr. Cannon and told him about [the false statements in the bankruptcy documents], the first thing that he did was he couldn't wait—even though the bankruptcy case was closed, he could not wait to change it.  Because I guarantee you, he didn't want anybody to think that he had made a false statement, that he wasn't disclosing everything.

(R. 98 at 1050).  This statement does not demonstrate an unreasonable inference from the evidence adduced at trial or an unfair response to the defendant's argument.  *See, e.g.*, *United States v. August*, 984 F.2d 705, 714-15 (6th Cir. 1992) (arguments that defendant sought to "trick" the jury were not categorically improper).  The district court found that the "statements made during the prosecutor's closing [were] based on proper inferences from evidence presented during the trial." (R. 127 at 4).  We agree.  Accordingly, we reject McAllister's claim of prosecutorial misconduct.

## 5. Ineffective Assistance of Counsel Claim

McAllister argues that defense counsel was ineffective for: (1) not objecting to numerous inappropriate comments made by the prosecutor and (2) failing to ask for an offer of proof when the judge excluded English from testifying.

"As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations. *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005).  "This court has routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so parties can develop an adequate record on this issue." *Id.* (internal quotation marks and citations omitted).  This rule "stems from the fact that a finding of prejudice is a prerequisite to a claim of ineffective assistance of counsel, and appellate courts are not equipped to resolve factual issues." *United States*

*v. Brown*, 332 F.3d 363, 368-69 (6th Cir. 2003).  The record here is not well-developed to decide if defense counsel's performance was deficient, or whether there is a reasonable probability that, but for the omissions of defense counsel, the result of the proceedings would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1987).   We therefore decline to consider McAllister's ineffective assistance of counsel claim on direct appeal.

III.

For the foregoing reasons, we AFFIRM the district court in part, and REMAND for the court to conduct findings on whether, upon consideration of all factors that bear on racial animosity, McAllister is entitled to a new trial.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

McKEAGUE, Circuit Judge, concurring **in part and dissenting in part.**  I am in agreement with practically all of the majority opinion.  I write separately to register my disagreement with remanding for further proceedings on McAllister's *Batson* challenge, because the district court's procedural error did not amount to "plain error."

The majority acknowledges that the Government carried its burden in responding to McAllister's *Batson* challenge by offering race-neutral explanations for peremptorily excusing venire person Willy Ewing.  The majority also acknowledges that McAllister then had the burden to rebut the Government's reasons on the record, but did not even request the opportunity to do so.  The majority recognizes that because of McAllister's failure to offer any rebuttal of the race-neutral reasons, his appellate challenge to the district court's denial of his *Batson* challenge is subject only to plain error review.  *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003).  That is, McAllister must show that the district court's abbreviated analysis of the *Batson* issue was not only (1) error (2) that was "plain," but also (3) adversely affected his substantial rights, and beyond that, (4) seriously affected the fairness, integrity or public reputation of judicial proceedings.  *United States v. Knowles*, 623 F.3d 381, 385-86 (6th Cir. 2010).  Ordinarily, we may grant relief for plain error only to prevent a miscarriage of justice, where the error infecting the trial was so plain that the trial judge and prosecutor are deemed derelict in countenancing it.  *Id.*

Despite recognizing the applicability of plain error review, the majority opinion does not explain how the defect in the district court's procedure—i.e., its failure to make explicit findings that were only implicit but nonetheless obvious—can be deemed to have resulted in a miscarriage of justice.  Nor does the opinion identify damage done to the integrity and reputation of the judicial proceeding, or even explain how McAllister's substantial rights were adversely affected.  In fact, although the majority, by carefully

examining the transcript of voir dire proceedings, has made a better case for finding plain error than McAllister, its examination culminates in the honest recognition that the record does not facially evidence purposeful discrimination. At worst, the majority concedes, the record may be viewed as showing that the district court's procedural error was "not necessarily inconsequential." This is clearly insufficient to justify relief under plain error review.[1]

No less troubling are the practical implications of the majority's flawed approach. The majority justifies its circumvention of the strictures of plain error review by observing that the district court had the "duty to independently assess all evidence with a bearing on racial discrimination." Extraordinary. Where the prosecution offers plausible race-neutral reasons for excusing a venire person, and the defendant states no objection and offers no evidence or argument challenging the credibility of the prosecution's reasons, the trial court is not entitled to assess their credibility and race-neutrality until it has first independently examined all relevant evidence that is easily accessible? Just how far, trial courts are left to wonder, does this "independent" duty extend? How closely must the trial court "examine" the easily accessible evidence? Just what evidence is to be considered "easily accessible?"

Here, the majority comes to the aid of defense counsel with the benefit of hindsight by scrutinizing the transcript of the voir dire proceedings. Voir dire in this case spanned two days. No transcript was easily accessible to the trial court during voir dire. If the trial judge lacked infallible memory of all potentially relevant answers given

---

[1]The majority posits that plain error review is no obstacle to relief in this case because a *Batson* error is a structural error. Indeed, if the court were to hold that a "*Batson* error" occurred—i.e., that the district court erred in its determination that Ewing was excused for race-neutral reasons and that Ewing's excusal was shown to be the product of purposeful race-discrimination—then, yes, a structural error would have been found, obviating the need for McAllister to show prejudice to his substantial rights.

If such a structural error were found, then the remedy would be reversal of the conviction and remand for new trial. The majority does not grant such relief, however, because it recognizes that the record does not evidence purposeful discrimination. To conclude that the record showed purposeful discrimination, the majority would have to overcome the great deference owed to the district court and find its contrary determination clearly erroneous. Instead, the majority remands for explicit fact-findings to determine *whether* a "*Batson* error" occurred—i.e., whether McAllister carried his burden of showing that the government's excusal of Ewing was motivated by racial animosity. The error thus identified by the majority is not structural error, but merely procedural error—a procedural error that *is* subject to plain error review because McAllister did not even object to and try to rebut the government's race-neutral showing.

by venire persons during two days of voir dire, was the judge obliged to hold the trial in abeyance until after obtaining a transcript and scrutinizing it for *potential* arguments that defense counsel had not thought to assert?  The majority answers, "yes," for it second-guesses the trial court's ruling and requires reconsideration based on evidence that was not readily accessible at the time of trial.

What about juror questionnaires?  In *United States v. Torres-Ramos*, 536 F.3d 542, 560-61 (6th Cir. 2008), juror questionnaires were considered to be easily accessible. Indeed, the questionnaires themselves were readily accessible, but what about the potentially relevant evidence that might be mined from them?  In the quiet deliberative solitude of an appellate judge's chambers, questionnaires may be compared and contrasted in a myriad of ways in search of inferential evidence that race-discriminatory animus may have played a role in a peremptory challenge.  But in the absence of a pointed objection by defense counsel to the prosecution's given reasons for the challenge, how long is the trial judge obliged to hold the trial at a standstill while he or she examines questionnaires for potential evidence?  What if the examination involves 30 or 50 or 100 or more questionnaires?  How thoroughly must the trial judge compare and contrast to satisfy his affirmative duty to independently examine?  If a reviewing court later identifies grounds for a suspicious inference that the trial judge overlooked or failed to mention in his ruling, does it necessarily follow that the trial judge breached his affirmative and independent duty?

The majority's ruling tends to undermine the balance inherent in our adversarial judicial system.  The courts "do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Nat'l Aeronautics and Space Admin. v. Nelson*, 131 S.Ct. 746, 757 n. 10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). Failure to enforce the requirement that a party state his claim or objection and support it with citation to law or evidence "will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes." *Carducci*, 714 F.2d at 177.  The plain error doctrine is prudently designed to enforce this requirement by providing

incentive for timely objection. Because McAllister did not challenge the prosecution's race-neutral reasons in the trial court, his appellate challenge is not entitled to plenary review, but only plain error review.**2** Plain error review still permits correction of a miscarriage of justice, but only if all four conditions are met.

The majority is justifiably critical of the district court's terse handling of the *Batson* challenge. However, the requirements for relief under plain error review are simply not met on the instant record. The majority has failed to identify grounds for concluding that the Government's race-neutral reasons were a pretext for race discrimination. Absent such a showing, the trial court's ruling, however terse, can hardly be deemed to have adversely affected either McAllister's substantial rights or the integrity and public reputation of the trial. The record does not even hint at the existence of a miscarriage of justice that warrants remand for further proceedings. Plain error has thus not been shown and we, therefore, lack authority to grant relief. Accordingly, I respectfully dissent.

---

**2**Not only did McAllister fail to object to the race-neutral reasons at trial; he has also failed to offer any rebuttal of them on appeal. He has not even argued grounds for finding the given reasons were actually a pretext for race-discrimination. His appellate challenge is directed exclusively at the technical procedural sufficiency of the district court's explanation of its acceptance of the prosecution's given reasons. This glaring void not only undermines the showing necessary to establish remediable plain error, but also indicates that remand for more complete fact-findings will be a waste of time.