NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0006n.06

No. 12–1972

**FILED**
Jan 08, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| JOHN COOK, | ) | |
| | ) | OPINION |
| Defendant – Appellant. | ) | |
| | ) | |

Before: McKEAGUE and STRANCH, Circuit Judges, and COLLIER, District Judge.[*]

**JANE B. STRANCH**, Circuit Judge. A jury convicted John Cook on several drug-related charges, and the district court sentenced him to 360 months of imprisonment. Cook now appeals, raising seven issues for our consideration. Because we find no reason to set aside the convictions or the sentence, we AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

At a young age Cook directed an extensive and well-armed crack cocaine and heroin distribution organization in the Brightmoor neighborhood of Detroit in the years between 2006 and 2008. He took control of nearly a dozen residences, using them to stash drugs and conduct drug packaging and distribution activities. Cook obtained powder cocaine from various sources in Detroit and then cooked that powder into crack cocaine, relying on a wide network of co-conspirators to

_____

[*]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

package and sell drugs for him. Many of the co-defendants in this case were Cook's distributors, including Edward Newman, DeShawn Carter, Talisha Woody, Keyana Rivers, Danny White, Pierce Colbert, Corey Wade, Jesse Jones, and Demound Reeves. Cook and his co-conspirators routinely carried firearms to protect drugs and drug proceeds from theft or seizure.

By early 2007, the growth of Cook's drug operation prompted him to begin servicing customers of rival drug dealers. A war over drug territory ensued, leading the rivals to engage in drive-by shootings and firebombings of each others' stash houses.

On one occasion, a rival drug dealer and his associates shot into and firebombed one of Cook's houses while Cook and others were inside. Cook and Talisha Woody suffered gunshot wounds, and Demound Reeves's brother, known as "Pickle," was killed. Shortly after the attack, Cook directed Newman, Carter, and two others to help him retaliate for Pickle's death by shooting into a house that belonged to the rival drug dealer Cook believed to be responsible for the killing. Cook met with his co-conspirators, told them the location of the rival's house, provided firearms, and promised he would take care of them after the job was done. On the way to the house, Cook's group spotted the intended target riding with others in a vehicle so they opened fire, killing Christopher Sowell, the brother of the intended target. After the homicide, Cook paid Carter one thousand dollars and instructed him to burn the silver Volvo used in the crime.

The fifteen-count superseding indictment charged Cook and numerous co-conspirators with various drug-related offenses, including conspiracy, continuing criminal enterprise, and intentional killing. At the conclusion of a twelve-day trial in March 2012, the jury convicted Cook of drug conspiracy involving 50 to 279 grams of cocaine base, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841 (Count Eleven);

2

and two counts of felon-in-possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Counts Four and Five). The jury acquitted Cook of engaging in a continuing criminal enterprise, intentional killing in furtherance of a continuing criminal enterprise, additional counts of possession with intent to distribute cocaine base and heroin, and additional firearm counts. The district court sentenced Cook to a term of imprisonment of 314 months on the conspiracy count (360 months with credit for 46 months served) and 120 months on the other drug and firearm counts, all terms to run concurrently. The court placed Cook on supervised release for a total term of eight years and imposed a $400 special assessment. We have jurisdiction of this direct appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II. ANALYSIS

Four of the issues raised on appeal relate to trial matters and three concern sentencing. None of the issues is sufficiently meritorious to require reversal of Cook's convictions or sentence.

## A. Trial Issues

### 1. Admission of evidence concerning Cook's physical assault of a co-conspirator

Cook argues that the district court erred by allowing the jury to hear evidence that he physically assaulted his pregnant girlfriend and drug distributor, Keyana "Kiki" Rivers. Cook concedes that the plain error standard governs our review. *See* Fed. R. Crim. P. 52(b); *Johnson v. United States*, 520 U.S. 461, 466–67 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993). We may grant relief only if we find "(1) "error," (2) that is "plain," and (3) that affect[s] substantial rights" of the defendant. *See Johnson*, 520 U.S. at 467 (internal quotation marks omitted). If these three conditions are satisfied, we may exercise our discretion to notice the forfeited error, but only

3

if we find that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See id.*

The government presented evidence of Cook's physical assault of Rivers to support the theory of the superseding indictment that Cook and his co-conspirators "used violence, including murder, and threats of violence to maintain their positions in the conspiracy, and to intimidate and eliminate rival drug traffickers." The government contends that evidence about the assault of Rivers demonstrated Cook using violence to control one of his drug distributors.

Co-conspirator Talisha Woody, who witnessed the assault, testified that Cook beat Rivers "like she was a man" striking her with closed fists and with "[w]hatever was in his way." According to Woody, Cook beat Rivers because "she was pregnant by him or because she was going to other guys' houses copping dope or something." She did not try to intervene to help Rivers because she "didn't want that same beating." Another co-conspirator, Edward Newman, also watched as Cook hit Rivers fifteen to twenty times with balled fist and open hand, but he did not intervene because "it wasn't [his] business, that was between him and his girl, and we don't need the police at no known drug house." Rivers did not know why Cook beat her.

This episode was one in a series of events demonstrating that Cook used violence to maintain his position in the conspiracy. Even accepting the view that this evidence may have been more prejudicial than probative, Fed. R. Evid. 403, Cook has not demonstrated that any clear or obvious error in admitting this testimony substantially affected his rights or the fairness and integrity of the judicial proceeding. *See Johnson*, 520 U.S. at 467. The jury heard multiple co-conspirators testify that Cook was routinely armed and provided firearms to others, that he was involved in shootings and firebombings of rival drug traffickers, and that he orchestrated the murder of Christopher

4

Sowell. Yet, the jury convicted Cook only of drug and firearm possession counts and acquitted him of the counts related to violent acts, including the killing of Sowell. The verdict suggests that the jury did not predicate its findings of guilt on Cook's propensity for violence. Because Cook has not shown how he was prejudiced by evidence that he physically assaulted Rivers, he has not carried his burden to show plain error warranting reversal of his convictions.

*2. Right to a public trial*

Cook contends that the district court removed his children from the courtroom, thereby denying him the Sixth Amendment right to a public trial. He relies on several cases defining the contours of his public trial right, *see Presley v. Georgia*, 558 U.S. 209 (2010); *Waller v. Georgia*, 467 U.S. 39 (1984); *Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009); *United States v. Jordan*, 544 F.3d 656 (6th Cir. 2008), but he has not provided a factual foundation for this argument.

On the morning of the third day of trial, the court called a sidebar to express her concern that "[t]his isn't the case for young children to be in the courtroom." Defense counsel identified one of the children as Cook's son. The court asked counsel if he "could find somebody else to . . . watch them," but the court acknowledged, "I don't know what you can do." Counsel replied that he would handle the matter at the end of the day.

Cook has not pointed to any evidence that the district court ultimately barred his children from the courtroom, nor has he produced any evidence to confirm that his counsel relayed the court's comments to his family members, who then attended the trial without the children or felt unwelcome to attend themselves. Even if we assume that the court's remarks caused Cook's young son to miss future days of trial, "courts have consistently refused to find Sixth Amendment violations when a courtroom closure is so limited as to be trivial." *United States v. Arellano-Garcia*,

5

503 F. App'x 300, 305 (6th Cir. 2012). Because Cook did not produce factual support for this argument and it appears that the court's action had no impact on the trial, we conclude that a Sixth Amendment violation did not occur.

### 3. Napping jurors

Cook next contends that the district court failed to take any curative action when jurors fell asleep during the trial. We review this issue for plain error because Cook admits that his counsel did not make an objection below. *See* Fed. R. Crim. P. 52(b); *Olano*, 507 U.S. at 732.

"[A] juror who sleeps through much of the trial testimony cannot be expected to perform his duties," *United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982), and if sleep "makes it impossible for [a] juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury." *United States v. Johnson*, 409 F. App'x 688, 692 (4th Cir. 2011) (quoting *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000)). A district judge has "considerable discretion in deciding how to handle a sleeping juror," and overturning the verdict "is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury." *Freitag*, 230 F.3d at 1023.

The trial took place in March 2012 when the Detroit area experienced unseasonably warm temperatures that affected the comfort of all trial participants. On the morning of March 15, the prosecutor informed the court that three jurors fell asleep on the previous afternoon "due to the heat" and asked the court to take action if it saw a juror sleeping. The court replied, "I think you can just bring it to my attention by interrupting and I will wake them up." The court noted that it had observed one juror doze off "for a second," and the court invited the lawyers to remove their suit jackets because "it is way too warm." When the jurors were brought into the courtroom, the court

6

said to them: "I don't see any of you in suit coats, but I have told the attorneys and anybody else if they want to take off their suit coats because it is very warm, and if you have sweaters or whatever feel free to take them off." The record shows that the court also ordered the placement of large fans to cool the courtroom because the court admonished witnesses more than once to speak louder to compensate for the noise of the fans. On March 19, the court requested a sidebar and told counsel, "I had a juror sleeping, which is really why I stopped," and before returning to testimony, the court asked the jurors, "Do you want to stand up for a second and shake out? I know it is hard to sit for long periods."

In light of this record, we disagree with the statement in Cook's brief that "the court took no curative action" to deal with sleeping jurors. The court was fully aware of the problem, took action to make the courtroom more comfortable for everyone, and interacted with the jurors in a subtle manner to be sure they were paying attention to the testimony. Cook points to no prejudice he suffered other than that three jurors were caught napping during the March 14 testimony of Nicole Chapman, a key government witness. The jurors' inability to stay awake during that testimony surely hurt the prosecution more than it hurt Cook, which is why the prosecutor brought the matter to the court's attention in the first place. Although jurors should remain awake and alert at all times during trial testimony, the court acted reasonably under the circumstances. We find no reason to set aside Cook's convictions on this ground.

### 4. *Prosecutorial misconduct*

The final attack on the convictions is Cook's assertion that the prosecutor committed misconduct during her rebuttal closing argument when she said: "The Court will instruct you what the [defense counsel] said during closing argument [is] not evidence. Their job is to distract you

7

from duty." No contemporaneous objection was made. During jury deliberations, the attorney for a co-conspirator argued that the prosecutor's comment was improper because it denigrated defense counsel. The attorney asked the court to bring the jurors into the courtroom and instruct them that the prosecutor overstepped her bounds in making the remark and that defense counsel have a Sixth Amendment obligation to represent their clients zealously. The prosecutor defended her remark as a proper statement in light of the defense closing arguments. Cook's counsel then joined the objection and the request for curative action. Because there had been no contemporaneous objection and the prosecutor's comment was made "in the heat of argument," the court refused to call the jury back for a curative instruction or to grant a mistrial.

The lack of a contemporaneous objection to the prosecutor's comment raises the standard of review on appeal to plain error. *See United States v. McAllister*, 693 F.3d 572, 585 (6th Cir. 2012). We must decide whether the comment was improper and, if it was, whether it was flagrant. *Id.* To determine flagrancy, we consider several factors, including whether the remark tended to mislead the jury or prejudice the defendant; whether the statement was isolated or in a series of improper statements; whether the prosecutor made the statement deliberately or accidentally, and the total strength of the evidence against the accused. *Id.*

Even if the prosecutor's deliberate comment was improper, reversal is unwarranted because the remark was not flagrant. This isolated comment occurred during rebuttal argument in response to defense arguments attacking numerous aspects of the government's case. Although the prosecution produced strong evidence of Cook's guilt, the jurors listened closely to the defense arguments and were not distracted from their duty. The jury acquitted Cook on most of the counts, especially those charging him with the most egregious and violent conduct. It is difficult to see how

8

Cook was prejudiced by the prosecutor's remark. The district court acted appropriately when it denied a mistrial and declined to draw undue attention to the comment by calling the jury to the courtroom to hear a curative instruction long after the comment was made.

**B. Sentencing Issues**

Cook raises three challenges to his sentence: the district court should not have imposed a four-level enhancement for Cook's role as an organizer or leader of the drug conspiracy; the court erroneously relied on acquitted conduct to set the offense level; and application of the 2011 version of the Guidelines Manual caused an *ex post facto* violation. Ordinarily, our first concern is whether the district court applied the correct version of the Guidelines Manual. *See* USSG § 1B1.11; *United States v. Tragas*, 727 F.3d 610, 620 (6th Cir. 2013). But if, under the facts of this case, the district court properly imposed the four-level aggravating role enhancement and properly relied on acquitted conduct to set Cook's offense level under the murder cross-reference found in USSG § 2D1.1(d)(1), then Cook's applicable guideline range is the same whether the 2007 or the 2011 version of the Guidelines Manual is used. Consequently, we first ask whether the district court properly applied the aggravating role enhancement and the murder cross-reference. We review "the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. McCloud*, 730 F.3d 600, 605 (6th Cir. 2013).

*1. Aggravating role enhancement*

The 2007 and 2011 versions of USSG § 3B1.1 **Aggravating Role** are identical. A court may add a four-level sentencing enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The commentary provides:

9

> *In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.*

USSG § 3B1.1, comment. (n.4). Whether this enhancement is warranted is a question of fact, and we review the district court's findings of fact for clear error. *United States v. Bennett*, 291 F.3d 888, 897 (6th Cir. 2002).

Having heard the trial testimony, the district court found by a preponderance of the evidence that there were more than five participants in the drug conspiracy, including Newman, Rivers, Chapman, Carter, and Woody. The trial record adequately supports this finding. All of the co-conspirators named by the court except Carter testified against Cook at trial, and the testimony of those witnesses confirmed that Carter participated in the drug conspiracy. The court also found that these five participants obtained their drug supply from Cook and that Cook organized people and stash houses. These findings, too, are well supported by the trial evidence.

Cook predicates his challenge to the enhancement on the court's use of the word "manager." He correctly points out that the court did not ultimately label him as an "organizer" or "leader." When we consider the court's comments in context, however, we have no doubt that the court found Cook to be *the* organizer and leader of the drug conspiracy. The PSR applied the four-level enhancement, Cook objected to it, and the parties disputed it at the sentencing hearing. Cook did not contend that the two-level or three-level enhancement under § 3B1.1 applied to him. Although district courts should carefully distinguish between "organizers or leaders" and "managers or

10

supervisors" when applying § 3B1.1, here the court found, based on the trial evidence, that the four-level enhancement applied because Cook was the organizer or leader of the entire organization and the criminal activity involved five or more participants. We will not set aside these factual findings because they are not clearly erroneous. *See Bennett*, 291 F.3d at 897. The four-level aggravating role enhancement applied to Cook.

### 2. *Use of acquitted conduct*

The jury acquitted Cook of the charge of intentional killing, but the district court considered the acquitted conduct in imposing sentence. Cook now challenges the court's use of the acquitted conduct as relevant conduct at sentencing, but he concedes our law is against him on this issue and he raises the argument only to preserve his right to further review. Our court has held that a district court does not violate the Sixth Amendment when it relies on acquitted conduct to enhance a guidelines sentence "so long as the resulting sentence does not exceed the jury-authorized United States Code maximums." *United States v. White*, 551 F.3d 381, 382 (6th Cir. 2008) (en banc). In reaching this holding, the court relied on the Supreme Court's pronouncement in *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *White*, 551 F.3d at 383 (quoting *Watts*, 519 U.S. at 157). We explained that *Watts* retained its vitality after the Supreme Court decided *United States v. Booker*, 543 U.S. 220 (2005), because the Supreme Court recognized in *Booker* that its decision was not inconsistent with *Watts*. *Id.* The cases we have decided after *Booker* further confirm, as other circuits have held, that district courts may rely on acquitted conduct to enhance a guidelines sentence if that relevant conduct is proved by a preponderance of the evidence. *Id.* at

11

383–84 (citing cases). No Sixth Amendment violation occurs "[s]o long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict." *Id.* at 385.

At the sentencing hearing, the district court initially calculated Cook's adjusted offense level as 36 using the 2011 version of § 2D1.1. The court then added four levels under USSG § 3B1.1(a) for Cook's aggravating role as an organizer or leader of the conspiracy. This brought the total offense level to 40. With a criminal history category of III, Cook faced an applicable guideline range of 360 months to life imprisonment under the facts found by the jury.

The district court then considered the cross-reference in § 2D1.1(d)(1), which provided:

> If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

In accordance with this provision, the district court made extensive factual findings to support its determination that the government proved by a preponderance of the evidence at trial that Cook orchestrated the first-degree murder of Christopher Sowell. Because Cook's offense level of 43 under the murder guideline, § 2A1.1, was higher than the offense level of 36 under the drug guideline, § 2D1.1, the court applied the higher offense level and then added four levels for Cook's aggravating role in the offense, for a total offense level of 47. With a criminal history category of III, the applicable guideline range was life imprisonment.

This calculation did not violate the Sixth Amendment. Although the new statutory minimums set by the Fair Sentencing Act (FSA) applied so that the drug quantity of 279 grams of crack cocaine found by the jury rendered Cook eligible for a mandatory minimum sentence of five to forty years in prison, *see Dorsey v. United States*, 132 S. Ct. 2321 (2012), the government also

filed an information under 21 U.S.C. § 851 charging Cook with a prior felony drug conviction, which he admitted. This increased the statutory minimum sentence to 10 years to life imprisonment. *See* 21 U.S.C. § 841(b)(1)(B). Cook received a sentence of 360 months, below the statutory ceiling set by the jury's verdict coupled with his admission to a prior felony drug conviction. *See White*, 551 F.3d at 385; *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013).

Because the district court followed the law, we find no error in the court's use of acquitted conduct in imposing sentence. Fortunately for Cook, the court did not punish him with a life sentence. After considering the § 3553(a) factors, the court sentenced him to 360 months in prison to give him some hope of his return to society as a productive citizen, considering his youthful age at the time of his crimes.

### 3. Ex post facto violation

Cook further contends that the district court should have applied the 2007 version of the Guidelines Manual even though the parties, the probation officer, and the court all agreed at the time of sentencing that the 2011 version of the Guidelines Manual applied. Because we affirm the application of the aggravating role enhancement and use of the murder cross-reference, Cook's *ex post facto* argument collapses.

The 2011 version of the Guidelines Manual included lower guideline ranges for some crack cocaine offenses, but it also added two new sentencing enhancements that did not exist in the 2007 version of § 2D1.1: two levels for the defendant's use or threat of violence, § 2D1.1(b)(2), and two levels for maintaining a premises for the purpose of distributing a controlled substance, § 2D1.1(b)(12). A district court's decision to apply these sentencing enhancements, thereby increasing a defendant's sentence for an offense committed before the enhancements took effect,

13

would create an *ex post facto* problem. *See Peugh v. United States*, 133 S. Ct. 2072, 2082 (2013). In this case, the district court included both of the new enhancements when it initially calculated Cook's sentence under the 2011 version of § 2D1.1. If the court had sentenced Cook under § 2D1.1 using these new enhancements that did not exist when he committed his crimes, an *ex post facto* violation would have occurred. *See id.* But Cook's sentence did not rest on § 2D1.1 and these enhancements. The court applied the cross-reference in § 2D1.1(d)(1), which directed the court to use the murder guideline, § 2A1.1, if the offense level under the murder guideline was higher than the offense level under § 2D1.1.

Both the cross-reference in § 2D1.1(d)(1) and the murder guideline, § 2A1.1, were identical in the 2007 and 2011 versions of the Guidelines Manual. Whether the court applied the 2007 or the 2011 version of the Guidelines Manual, the cross-reference required the court to apply the higher offense level of 43 under the murder guideline instead of the offense level of 34 under the 2007 version of § 2D1.1 or offense level 36 under the 2011 version of §2D1.1. Adding four levels for Cook's aggravating role in the offense, the ultimate calculation was the same using either version of the Guidelines Manual: total offense level 47, criminal history category III, with an applicable guideline range of life imprisonment. The district court did not base Cook's sentence on the new enhancements in the 2011 version of § 2D1.1, and therefore, no *ex post facto* violation occurred.

### 4. Sentencing factors and elements

Finally, Cook argues that *Alleyne v. United States*, 133 S. Ct. 2151 (2013), impacts his sentencing. In *Alleyne*, the Supreme Court held that any fact that increases the mandatory minimum sentence for a crime, other than the fact of a prior conviction, is an "element" of that crime, not a sentencing factor, and must be submitted to the jury for determination. 133 S. Ct. at 2160 n.9,

2162–63. The district court's approach at sentencing complied with *Alleyne*. The court relied on the drug quantity found by the jury, the government's § 851 information, and Cook's admission to the charged prior felony drug offense to increase the statutory mandatory minimum penalty applicable to his drug convictions to ten years to life imprisonment. No statutory mandatory minimum applied to his convictions for being a felon in possession of a firearm. Because the district court sentenced Cook in accordance with the jury's findings and Cook's own admission to a prior felony drug conviction, *Alleyne* does not require us to reverse Cook's sentence.

## IV. CONCLUSION

The trial evidence fully supported the jury's verdict of guilty on the four counts of conviction. The same evidence further supported the district court's factual findings at sentencing. Because Cook has not demonstrated a significant trial or sentencing error, we AFFIRM the convictions and sentence.