NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0636n.06

No. 11-5442

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jun 18, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| GLENNA R. CAMPBELL, | ) | O P I N I O N |
| | ) | |
| *Defendant-Appellant.* | ) | |

BEFORE:    BOGGS and COLE, Circuit Judges; and OLIVER, Chief District Judge.[*]

COLE, Circuit Judge.  Defendant-Appellant Glenna Campbell was accused of fraudulently preparing money orders made out in her and her husband's name, and using them to pay credit card bills and other personal expenses.  Campbell was convicted of one count of wire fraud in violation of 18 U.S.C. § 1343, seven counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of money laundering in violation of 18 U.S.C. § 1957.  She was sentenced to forty-one months in prison.  On appeal, she argues that the government failed to demonstrate an interstate nexus for the wire-fraud and mail-fraud convictions, and that the district court improperly admitted the testimony of Special Agent Scott Kennedy regarding Campbell's income and expenditures.  For the reasons set forth below, we AFFIRM the convictions.

---

[*]The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

## I.  BACKGROUND

Beginning in 1986, Campbell worked as the office manager for the Stewart Pharmacy, a family-owned business in McMinnville, Tennessee.  As part of her responsibilities, Campbell was in charge of the Pharmacy's business of selling money orders.  Campbell had day-to-day access to the record of money orders sold in the pharmacy, as well as the cash box and bank account that were associated with the money-order business.

In January 2009, the Stewart family became suspicious of Campbell's stewardship of the pharmacy.  When the Stewarts attempted to audit the financial records of the pharmacy, Campbell resisted.  At the same time, a shipment of batteries arrived at the store with Campbell's name on the order.  The Stewarts then audited the money-order records, which revealed money orders totaling five to seven thousand dollars per month that were issued to Campbell or her husband, without any record of Campbell paying for them.  When a video camera was installed in Campbell's work area, it showed Campbell taking money out of the money-order cash box.  In July 2009, Campbell was fired from the pharmacy.)

A certified public accountant hired by the Stewarts discovered that Campbell issued 409 money orders to herself or to her husband from 2002 to 2009.  These orders totaled over $146,000. The Campbells used these money orders to pay the their credit card bills.  The Campbells, in turn, used the cards to fund a number of purchases, including payments on several Jeep Wranglers, season tickets to the Tennessee Titans, and jewelry.

The government indicted Campbell and her husband[1] on one count of wire fraud, 18 U.S.C. § 1343, stemming from a credit-card purchase of jewelry that was processed by an out-of-state processing center. In addition, Campbell was indicted on seven counts of mail fraud, 18 U.S.C. § 1341, stemming from fraudulent money orders mailed to credit card companies to pay outstanding credit-card balances. Finally, Campbell was indicted for conspiracy to launder money, 18 U.S.C. § 1956(h), and money laundering, 18 U.S.C. § 1957. At trial, the government called Special Agent Kennedy to testify regarding his investigation into the Campbells' finances. Using the "expenditure method" of accounting, Kennedy concluded that the purchases made by the Campbells during the period covered by the indictment were far greater than would be predicted, based on their reported income.

At the close of the government's case-in-chief, Campbell moved for a directed verdict on the mail-fraud and wire-fraud charges, arguing that there was no nexus between the theft of the money orders and the use of the mail or wires. The district court denied the motion. The motion was renewed at the close of evidence, and was again denied. The jury convicted Campbell on all counts except for the conspiracy-to-launder-money charge. Post trial, Campbell filed a motion for judgment of acquittal, which was denied. The district court sentenced Campbell to forty-one months of imprisonment, and ordered her to pay restititution to Stewart Pharmacy.

Campbell appeals, challenging the denial of the motion for judgment of acquittal, as well as the admission of the testimony of Special Agent Kennedy.

---

[1]Bill Campbell was acquitted of all charges at trial.

II.  ANALYSIS

*A. Wire and Mail Fraud Convictions*

Campbell argues that there is insufficient evidence to support her convictions for mail and wire fraud.  "For appeals from a denial of a judgment of acquittal based on the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found essential elements of the crime." *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) (internal quotation marks, alterations, and citations omitted).  To convict a defendant of mail fraud under 18 U.S.C. § 1341, the government must demonstrate beyond a reasonable doubt "(1) a scheme to defraud, and (2) [that defendant caused] the mailing of a letter, etc., for the purpose of executing the scheme." *United States v. Martinez*, 588 F.3d 301, 316 (6th Cir. 2009) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)).  Similarly, a wire-fraud conviction under 18 U.S.C. § 1343 requires the government to demonstrate beyond a reasonable doubt "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *Id.* (quoting *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000)).

The heart of Campbell's argument on appeal is that the "scheme to defraud" for purposes of the mail and wire fraud encompasses only the appropriation of the money orders from Stewart Pharmacy.  In the defendant's view, once she obtained the money orders the scheme ended, and thus the use of the mail or wires after the fact was wholly unrelated to the scheme itself. *See United States v. Maze*, 414 U.S. 395, 402 (1974) (vacating a mail-fraud conviction where the mailing involved previously paid invoices); *Parr v. United States*, 363 U.S. 370, 393 (1960) (same); *Kann*

*v. United States*, 323 U.S. 88, 94 (1944) (vacating a mail-fraud conviction where the mailing consisted of previously cashed checks).

"To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (citing *Pereira*, 347 U.S. at 8). "It is sufficient for the mailing to be incident to an essential part of the scheme . . . or a step in [the] plot." *Id.* at 710 (internal quotations and citations omitted) (second alteration in original). In *Schmuck*, the Supreme Court held that the act of mailing car registrations containing falsified mileage numbers was an essential component of a scheme to sell cars at inflated prices. *Id.* at 711-12. This is despite the fact that the actual fraudulent act, rolling back the odometers on the cars, had already been accomplished at the time of the mailing. The court noted that the scheme as a whole was only complete when the cars were sold by the dealers, and without the misleading title documents those sales would not have been possible. *Id.* at 712; *see also United States v. Henson*, 848 F.2d 1374, 1378 (6th Cir. 1988) ("For a mailing to be in furtherance of a scheme, the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing." (internal quotation marks and citations omitted)).

As *Schmuck* makes clear, a fraudulent scheme is not complete until the perpetrator has secured the benefits of the scheme. In this case, that includes Campbell's payment of her credit-card bills and her purchase of goods and services for personal use. Campbell's definition of the scheme to include only taking possession of the money orders is without merit, as money orders are useless until they are used to purchase goods or pay off a debt. When the purchases and payment of debts are included in the scheme, the use of the mail and wires becomes part of an essential step in the

overall plan, as Campbell could not have paid her debts or used her credit card without making use of the some means of mail or wires in this case. As such, a rational juror could conclude that the government demonstrated that the use of the mail or wires was part of the scheme to defraud.

Furthermore, the indictment's articulation of the scheme to defraud is broad enough to encompass all of the conduct that forms the basis of the counts of conviction. Under "Scheme to Defraud," the government alleged not only that "defendant GLENNA R. CAMPBELL would and did embezzle cash and money orders," but also that "the defendants would and did use the cash and money orders to buy services, goods, and merchandise" and "the defendants would and did use credit cards for some purchases and use stolen money orders to pay the credit card bills." We have held that the scheme as defined in the indictment is controlling for purposes of calculating the proper amount of restitution when the case goes to the jury. *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011). Similar logic applies here. The broad definition of the scheme in the indictment was before the jury when they returned the convictions, and thus we presume the jury was using that definition when it considered whether the government established the required elements of mail and wire fraud. Thus, we cannot say that it was irrational for the jury to find that the use of the mail and wires was in furtherance of the scheme to defraud.

*B. Testimony of Special Agent Kennedy*

Campbell also challenges the admission of the testimony of Special Agent Kennedy, an investigator with the Internal Revenue Service. As a preliminary matter, Campbell did not object to the admission of Kennedy's testimony at trial. We therefore review the admission of the testimony for plain error. *United States v. Baker*, 458 F.3d 513, 519 (6th Cir. 2006). For plain error

to occur "there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (internal quotation marks, alterations, and citations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (alterations omitted).

Special Agent Kennedy testified regarding the expenditure analysis he conducted on the Campbells' personal finances. In essence, he looked at the value of their purchases over the period of time covered in the indictment, and determined that their value was significantly greater than the amount of income the Campbells claimed on their federal tax return and assets listed on credit applications. He did not conduct the more complex net-worth analysis common in tax-fraud cases, which requires the government to establish a baseline of assets and cash on-hand prior to the period where the defendant was alleged to have engaged in fraudulent activity. However, Special Agent Kennedy never represented that he was engaging in net-worth analysis, but instead stated clearly that he lacked the records necessary to conduct that analysis. All Special Agent Kennedy was able to state was that the purchases made by the Campbells could not be reconciled with the income and other assets that the Campbells disclosed.

In light of the limited scope of Agent Kennedy's testimony, it was not error, let alone plain error, to admit it at trial. Unlike in tax-evasion cases, the government had no burden to prove that the Campbells' expenditures stemmed from the fraudulent activity. Instead, Special Agent Kennedy's testimony was offered to show that the Campbells had personally profited in some manner from the fraudulent money orders. While Campbell argues that Special Agent Kennedy's

testimony is unfairly prejudicial, "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Howard*, 621 F.3d 433, 457 (6th Cir. 2010) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). Campbell has no argument as to why Special Agent Kennedy's testimony would "suggest [a] decision on an improper basis." *Id.* Campbell was free to argue, and did argue, that the discrepancy found by Special Agent Kennedy could be explained by the Campbells' dipping into personal savings, and thus Special Agent Kennedy's conclusion was not a reliable picture of the Campbells' finances. The fact that the jury did not accept Campbell's argument in voting to convict does not mean that the testimony was improperly prejudicial. *See United States v. Cosgrove*, 637 F.3d 646, 658 (6th Cir. 2011) ("All of these arguments go to the weight the jury should afford the evidence, not to its admissibility. Trial counsel was able to raise each of these points at trial, both through cross examination and closing arguments.").

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Campbell's conviction and sentence.