NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0458n.06

Case Nos. 13-1606; 13-1607; 13-1778; 13-1781

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jun 26, 2014<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| SHANSHAN DU and YU QIN, | ) | MICHIGAN |
| | ) | |
| Defendants-Appellants/Cross-Appellees. | ) | |
| | ) | |
| | ) | |

_____/

**BEFORE: MERRITT, COOK, and STRANCH, Circuit Judges.**

**MERRITT, Circuit Judge.** A jury convicted Defendant-Appellants Yu Qin and Shanshan Du on multiple counts relating to the theft of trade secrets from General Motors ("GM"). On appeal, Qin and Du both challenge their convictions, and the government cross-appeals their sentences. For the reasons below, we AFFIRM.

### I. Background

Qin and Du—husband and wife—are both engineers. This case centers on their possession of a large number of GM documents containing information on hybrid motor technology. The government's theory was that Defendants stole GM technology for use in hybrid motors they planned to sell to a Chinese carmaker. Defendants claim the possession was innocent.

*United States v. Du, Qin*, Case Nos. 13-1606/ 1607/ 1778/ 1781

Du began working for GM on its hybrid vehicle development team in 2000. Hybrid vehicles have motors that operate alternatively on electric or gasoline power, requiring specially engineered hardware and computer software. The brain of the operation is a complex computer program called the "motor control source code" that controls how and when the electric motor runs. In November 2003, Du was reassigned to the GM group working on hybrid motor control after she expressed interest in its work. She left GM in March 2005.

During this time, Qin worked for Controlled Power Company. In August 2005, however, Controlled Power fired Qin after it learned that he was selling competing products through a side business named Millennium Technologies International ("MTI") that he and Du founded together. After interviewing Qin about MTI, Controlled Power seized files from Qin's office and discovered a large number of GM's proprietary files in Qin's possession.

A subsequent investigation by the government showed that, while Du was working for GM, she had downloaded thousands of GM proprietary documents onto personal storage devices that she and Qin used for MTI business. These included more than a dozen documents—many unrelated to her work—that contained GM's motor control source codes and schematics for hybrid motor parts. She shared the motor control code with Qin, who copied part of it by hand. Du held onto the GM files after leaving the company, though she had certified to GM that she had returned all of its property.

The investigation also showed that, when Du was with GM, she and Qin had begun planning a joint venture to develop and manufacture hybrid vehicle motor control systems for Chery Automobile, a Chinese carmaker. A partner in China drafted a business plan, and shortly before he was caught with the GM documents, Qin formalized its management team. According to the government's expert at trial, the joint venture sought to use technology similar to GM's

technology. In the expert's opinion, the joint venture would not have been able to meet the aggressive timeframe in its business plan if it had developed the technology on its own.

In February 2006, a GM attorney interviewed Defendants about the GM documents found in their possession. At the meeting, both Qin and Du denied still possessing any GM files. However, three months later, the FBI executed a search warrant on Defendants' home and recovered more GM documents. The FBI also issued subpoenas for business records belonging to MTI and another company that Qin operated. That same day, an FBI surveillance team observed Qin discarding two garbage bags full of shredded documents into a grocery store dumpster. The FBI reconstructed the documents, some of which agents believed were responsive to their subpoenas.

On July 21, 2010, a grand jury indicted Defendants for (1) conspiring to possess trade secrets without authorization, in violation of 18 U.S.C. § 1832(a)(5), (2) two counts of unauthorized possession of trade secrets, in violation of 18 U.S.C. § 1832(a)(3); and (3) three counts of wire fraud, in violation of 18 U.S.C. § 1343. Qin alone was indicted on one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1).

On November 30, 2012, the jury convicted Qin on all counts. It convicted Du on the conspiracy and trade secrets counts, but acquitted her of the wire fraud counts. After trial, Defendants renewed their motion for judgment of acquittal and new trial, which the district court denied. It then sentenced Qin to thirty-six months' imprisonment and imposed a $25,000 fine. It sentenced Du to twelve months and one day of imprisonment with a $12,500 fine.

## II. Analysis

Defendants raise five challenges to their convictions, based on a *Batson* challenge to jury selection, the admissibility of evidence, sufficiency of the evidence, prosecutorial misconduct, and insufficient jury instructions.

### A. Batson *Challenge*

Du and Qin argue the district court erred in denying their *Batson* challenge following the government's peremptory strike of a juror allegedly of Asian descent.

"The Equal Protection Clause prohibits a party from using peremptory challenges to exclude members of the venire on account of their race." *United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)). "A *Batson* challenge entails three distinct and sequential steps: (1) the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race; (2) the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; (3) finally, the trial court must determine whether the opponent of the peremptory strike has proven purposeful discrimination." *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012). "During step two, the burden of *production* shifts to the proponent of the peremptory strike; however, the burden of persuasion regarding racial motivation never shifts from the opponent of the strike." *Id.*

We review the district court's decision on a *Batson* challenge with deference and for clear error. *Id.* A factual finding by the district court is clearly erroneous if a review of the record leaves this Court "with the definite and firm conviction that a mistake has been committed." *United States v. McGee*, 494 F.3d 551, 554 (6th Cir. 2007) (quotation marks omitted).

Defendants argue that the government struck an Asian juror while allowing similarly situated white women on to the jury, *see Miller–El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). But in this case Du and Qin cannot meet their ultimate burden at step three of the *Batson* analysis to prove purposeful discrimination. Assuming the struck juror was of Asian descent, the "similarly situated" jurors differed enough to give the government's race-neutral explanation sufficient credence. The government stated that it struck the prospective juror because his master's degree in engineering and experience with computers raised a concern "that he would not accept the testimony, that he would be questioning it himself based on his own experience as opposed to basing his verdict on what he hear[d] in court." (R. 192 at 139-40, PageID# 2533-34.) The struck juror worked at the time for Hewlett-Packard as an information specialist—a role that, he said, dealt with computer programming. (*Id.* at 122-24, Page ID# 2516-18.) By contrast, neither of the other two jurors used as comparisons by Defendants had a formal engineering education. And, while one had worked briefly as a contract computer programmer for General Motors ten years earlier (*id.* at 107-08, Page ID#2501-2), neither worked in a comparable role to the struck juror at the time of the trial. Based on these facts, it is impossible to say the district court clearly erred in its conclusion.

Finally, while the district court did not provide a detailed explanation of its decision, this alone does not make its decision clear error. At the third step, the district court has a responsibility to judge the persuasiveness of the proffered race-neutral explanation and determine if the party opposing the strike has met its burden to show discriminatory intent by a

preponderance of the evidence. *McAllister*, 693 F.3d at 580. A district court errs if it truncates the *Batson* analysis by "mechanically accepting" the proffered justification. *United States v. Cecil*, 615 F.3d 678, 686 (6th Cir. 2010).

Here, the district court rejected the *Batson* challenge after the government offered its race-neutral explanation and the defense offered a brief rebuttal. The court stated: "I don't think there is any basis for a Batson" before allowing the proceedings to continue. (Tr. R. 192 at 140, Page ID#2534.) Defendants liken this statement to *McAllister*, where the district court failed to explicitly engage in the third step of *Batson* or state its conclusion, causing this Court to remand for further findings of fact. 693 F.3d at 580–82. However, unlike in *McAllister*, the district here did hear some rebuttal and clearly gave its conclusion—even if it did not explain its reasoning. This suffices. *See, e.g.*, *Braxton v. Gansheimer*, 561 F.3d 453, 462 (6th Cir. 2009) (finding the record showed the trial court had "adequately and reasonably conveyed its decision," even if it did so in "abbreviated fashion."). Ultimately, Defendants' *Batson* challenge fails.

### B. Rule 404(b) Evidence

Defendants next argue that the district court erred in allowing the government to introduce testimony by Chris Tazzia, the CEO of Controlled Power (Qin's former employer), along with audio clips of Controlled Power's interview of Qin the day it fired him. They argue these fell within the scope of 404(b) evidence that this Court had deemed inadmissible on interlocutory appeal in *United States v. Qin*, 688 F.3d 257 (6th Cir. 2012).[1]  (Du First Br. at 30.)

---

[1] Before trial, a different panel of this court affirmed the district court's order prohibiting the government from introducing 404(b) evidence relating to Qin's misappropriation of Controlled Power property and employee time. *Qin*, 688 F.3d at 263, 265 (the government would violate Rule 404(b) if it offered "evidence that Qin misappropriated CPC electrical parts for use in MTI products, that he used CPC forms and documents for the benefit of MTI, and that Qin and his subordinates conducted MTI business during CPC work time").

At trial, however, the district court determined that Tazzio's testimony and audio clips constituted background evidence and not 404(b) evidence. (*See* R. 196 at 12, Page ID#2900; R. 197 at 5, Page ID#3009.) We review the admission of background evidence for abuse of discretion. *United States v. Lamar*, 466 F. App'x 495, 499 (6th Cir. 2012).[2]

Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, evidence of other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In addition, "[w]here the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable." *United States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010). This "background evidence", or *res gestae*, "is a narrow category of evidence that typically provides context for the jury, either because it is directly probative, acts as a prelude to the offense or arises from the same events, forms an integral part of a witness's testimony, or completes the story of the offense." *United States v. De Oleo*, 697 F.3d 338, 344 (6th Cir. 2012).

As CEO of Controlled Power, Tazzia testified to the circumstances surrounding Qin's termination from the company and how Controlled Power discovered the GM documents in Qin's possession. Defendants concede that "Qin's firing from [Controlled Power] was background on the seizure of the MTI hard drive and the discovery of GM's alleged trade

---

[2] The government argues that this Court should review the admission of the audio clips for plain error because Defendants failed to object in a timely fashion at trial. However, the record shows that Defendants broadly objected to Tazzia's testimony before and during trial, and to the admission of an audio clip during trial. (*For Audio: See* R. 196 at 111–112, Page ID# 2899–2900.)

secrets." (Du First Br. at 32.) However, they argue that the government went beyond this background purpose and used 404(b) character evidence to show "that Qin was a thief" and liar, and, by association, so was Du. (*Id.* at 31.) Specifically, they argue the evidence was improperly admitted to show that: (1) "Qin used [Controlled Power] employees to conduct business on behalf of his company on [Controlled Power] time," in violation of this Court's decision on interlocutory appeal; (2) Qin sold products that competed with Controlled Power; and (3) he "lied to his soon-to-be ex-employer about his actions." (Du First Br. at 30.)

*Evidence of Controlled Power Employees' Work for MTI.* Despite Defendants' claims otherwise, Tazzia did not testify that Qin had Controlled Power employees working for his side business while on the clock for Controlled Power. Tazzia testified that some Controlled Power engineers worked on MTI projects for Qin, but did not say when they did so. Nor did he suggest they did so using his company's property. (*See* R. 196 at 30–36, Page ID# 2918–24.) His testimony did not violate this Court's decision in *Qin*. *See* 688 F.3d at 263.

*Evidence of Qin's Competition with Controlled Power.* The government did introduce evidence that Qin sold technology that competed with Controlled Power's products. Tazzia testified that he had learned from an employee that Qin was selling "products that were competitive to Controlled Power." (R. 195 at 130, Page ID#2837.) He also testified that Qin was fired for "employment in a competing business and for breach of fiduciary duties as a vice president." (R. 196 at 68, Page ID# 2956.)

While this evidence may have painted Qin in an unfavorable light, it was properly admitted as background information—along with Qin's firing—that completed the story of the offenses. Controlled Power's discovery that Qin was operating a competing company explained why the company's representatives took measures to question Qin and record their meeting. It

explains why they then took aggressive measures to seize his computing devices, leading to the discovery of proprietary information that formed the basis of the charges. Without this piece, the jury would be left without any context of why Qin had been treated so confrontationally, much less why he had been interviewed in the first place. This information was also intertwined with the offenses. Defendants' side businesses were the vehicle through which they allegedly intended to use GM's trade secrets.

*Evidence of Qin's lies.* The government also introduced evidence that Qin lied about and attempted to cover up his involvement with MTI. Audio clips showed Qin, under questioning by Controlled Power representatives, denying that (1) he was involved with MTI, (2) any Controlled Power employees had worked for MTI, and (3) he had brought a briefcase to work that day. (R. 196 at 13, Page ID# 2901.) Tazzia's testimony and accompanying exhibits showed these denials to be lies. In one audio clip, Qin is heard making a phone call in Chinese directing an employee he supervised to retrieve Qin's briefcase from his office and store it in the employee's office (where Controlled Power later seized it). (*Id.* at 11, Page ID#2899.) Defendants argue that the government used this evidence simply to paint him as a liar.

While the district court treated this as background evidence, the government did not need to show that Qin lied repeatedly in his exit interview to explain why Controlled Power fired him or how it discovered the GM trade secrets. Rather, the audio clips and accompanying testimony had an admissible non-character purpose to show knowledge and consciousness of guilt, as the government argued before the district court. *See e.g.*, *United States v. Trujillo*, 376 F.3d 593, 604–05 (6th Cir. 2004) (holding district court did not abuse its discretion in admitting evidence that defendant charged with drug-trafficking conspiracy paid a third-party to title cars used to traffic marijuana in her name in part because this showed consciousness of guilt); *United States*

*v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993) (finding possession of counterfeit identification documents showed defendant sought to conceal his travel and was admissible as evidence of consciousness of guilt). Qin's lies about his briefcase and employees directly showed an attempt to conceal his MTI-related work. Similarly, his denial of any personal involvement in MTI overall showed an attempt to insulate himself from the knowing illegal use of GM's proprietary information. These were properly admitted.

### C. Sufficiency of Evidence

Defendants next argue that that government failed to present sufficient evidence to support convictions on the trade secrets, wire fraud, and obstruction of justice charges. We review a sufficiency of evidence challenge by determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[3]

#### 1. Unauthorized Possession of Trade Secrets

18 U.S.C. § 1832(a) provides:

> Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
> . . .

---

[3] The government argues that the "manifest miscarriage of justice" standard applies to Defendants' challenges on the obstruction of justice and wire fraud counts because they failed to raise these arguments in their motions for judgment of acquittal. However, if a defendant's challenge to the sufficiency of the evidence in his Rule 29 motion is general in nature, then unarticulated grounds are preserved on appeal. *See United States v. Chance*, 306 F.3d 356, 368–71 (6th Cir. 2002). Based on the language of Defendants' two Rule 29 motions, the colloquy, and the trial court's rulings, it is unclear whether Defendants' initial sufficiency challenge was general in nature. Thus, we decline to apply this more rigorous standard. *See id.* at 371; *United States v. Gravely*, 282 F. App'x 401, 404 (6th Cir. 2008).

(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

. . .

shall . . . be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C.A. § 1832(a)(3) (2006). The indictment identified eighteen documents found in Defendants' possession that related to GM's hybrid motor technology and that government witnesses testified constituted trade secrets. Defendants make several arguments about the government's failure to show sufficient evidence to meet this statutory definition: First, the documents did not contain trade secrets; second, Du had authorization to obtain the documents; and third, Defendants did not intend to convert the information.

### a. Trade Secrets

Defendants first argue that the government failed to show that the documents actually contained trade secrets, rather than publicly accessible information. For information to qualify as a "trade secret" under the statute, its owner must have "taken reasonable measures to keep such information secret," and "the information [must] derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public." 18 U.S.C. § 1839(3)(A)–(B). In other words, there are three requirements: (1) the owner took "reasonable measures" to keep the information secret, (2) the information is not readily ascertainable by the public, and (3) the information derives economic value from its secrecy. Defendants dispute the first two of these elements.

*Reasonable measures.* There is not a single definition for what constitutes "reasonable measures," though this Court has looked to physical security measures at facilities and confidentiality agreements relating to sensitive information. *See, e.g.*, *United States v. Howley*,

*United States v. Du, Qin*, Case Nos. 13-1606/ 1607/ 1778/ 1781

707 F.3d 575, 579 (6th Cir. 2013) (finding that a company took reasonable measures to keep its product design secret by fencing its plant, installing security checkpoints, prohibiting photography during plant visits, requiring advance permission to visit, and requiring suppliers to keep its proprietary information secret). The statute does not require a particular technology to be kept "under lock and key" if "other security measures make such a step unnecessary." *Id.*; *see United States v. Chung*, 659 F.3d 815, 825–26 (9th Cir. 2011) (noting that "limiting access to a trade secret on a 'need to know basis' and controlling plant access" may constitute reasonable measures).

Here, GM took similar overall physical security measures as the company in *Howley*. Du worked at a locked facility monitored at all times by security guards, who required employees to show a photo identification to enter. Among other tasks, these guards checked all bags and computer devices carried out of the building, patrolled the facility after hours, and escorted visitors within the facility. (R. 197 at 10–16, 23, 28–29, Page ID#3014-20, 3027, 3032-3033.) GM installed the digital equivalent of these physical security checkpoints on its computer network. For instance, the server at Du's facility had a password-protected firewall preventing access from unauthorized users outside the facility. Use of GM computers within the network also required a unique user name and password. In addition, access to particular folders on the server containing information about the hybrid vehicle development required another password and permission from a manager, who authorized access only if an employee needed the files for work. (*Id.* at 35–41, 53, Page ID#3039–45, 3057.)

GM also had formal policies and practices governing confidentiality and information security. These included non-disclosure agreements signed by employees and an information security policy requiring employees to protect the company's proprietary information and

limiting their access to this information on a "need to know basis." (R. 201 at 88–89, Page ID#3653–54; R. 205 at 38–41, Page ID#4185–87.) The security policy also included a classification system for marking documents "secret" or "confidential," (R. 205 at 14–20, Page ID#4161-67) though none of the documents at issue here were so marked.

Defendants argue GM's policies "suffer[ed] from a lack of clarity and . . . a lack of enforcement," making them unreasonable. (Du First Br. at 37.) Defendants make much of what they consider contradictory testimony by different GM employees about GM's classification policy—specifically, differing testimony about when, whether, and by whom a document should be marked. (Du Br. 38–39; Qin Br. at 46.) However, the jury could have viewed these inconsistencies as irrelevant, given testimony that this policy was to a certain extent discretionary. As GM's chief information security officer explained, marking a document increased the security protocols governing that document, making sharing between engineers more cumbersome. Thus, employees deciding whether to mark a document had to "balance . . . the risk of exposure of the document and the ability to effectively share that document." (R. 205 at 19-26, 53-56, Page ID#4166-73, 4200-03.)

*Readily Ascertainable Information.* As to the second element of the trade secret definition that the information not be "readily ascertainable" to the public, Defendants argue that the GM documents contained information available in textbooks and online.

While some witnesses testified that motor control source codes in general can be found online, Defendants ignore testimony from multiple witnesses that the specific information in the documents was not in the public domain. The government's expert found "no examples" of this information published with the level of detail included in the documents and testified that a few engineers could not independently come up with the technology, which appeared to him to be the

work of a team of engineers "working over many years." (R. 204 at 107-09, Page ID#4061–63.) As to the source code specifically, he stated that "it is really frankly . . . inconceivable" that an automaker would distribute such "tightly controlled" information publicly. (*Id.* at 110.)

### b. Authorization

Defendants next argue that insufficient evidence supported a finding that Du and Qin "stole or appropriated, obtained, or converted without authorization" the trade secrets for which they were convicted. They argue that Du had access to the documents and needed them to catch up on motor control technology with which she was unfamiliar.

While Defendants highlight some statements to this effect, they ignore the substantial evidence the government introduced showing otherwise. To begin, it is undisputed that Qin— who never worked for GM—did not have authorization to possess GM's proprietary documents relating to hybrid vehicles. This was made explicit in testimony. (R. 202 at 54–55, Page ID#3743–44.) Sufficient evidence showed Du, too, did not have authorization to access the documents or to possess them after she left the company. Du's supervisor, Hubbard, specifically identified at least half a dozen documents found in Defendants' possession that he said Du did not need for her work. These included documents relating to hybrid technology for large-scale transit vehicles that Du never worked on. (R. 201 at 95–103, 108–11, 113–14.) As he explained, if Du did not need to know the information, she did not have authorization to access it or take it home. (See, e.g., R. 202 at 41.)

Defendants argue that Hubbard broadly "assigned [Du] to learn about motor control" (R. 201 at 113), which gave her reason to access some of the files relating to motor control. However, enough evidence indicates this assignment would not mean she had authorization to dig through GM's files. As Hubbard explained, he and his team of engineers did not have access

to the GM motor control codes, and the company's "need to know" policy made even "peeking" into the files "out of bounds." (*Id.* at 100–01.) Finally, even if Du had been authorized to review these documents, it is undisputed that she was not authorized to keep any GM information contained in the documents after her termination in 2005. (See e.g., *Id.* at 89; R. 202 at 45.)

*c. Intent to Convert*

Defendants next argue that the government failed to establish they had intent to convert trade secrets and injure GM, as required under the statute. Qin argues that he had no way of knowing the GM documents contained trade secrets and that he possessed them in order to help Du work through and understand the source code. (Qin First Br. at 53.) For her part, Du argues that her possession was innocent and she took no part in Qin's venture with Chery. (Du First Br. at 53.)

While Defendants raised these defenses at trial, the government for its part introduced evidence to the contrary from which the jury could have inferred intent. Its witnesses testified that Du had downloaded thousands of GM documents—including more than a dozen identified at trial as containing trade secrets—onto personal devices that she shared with her husband. Many of these did not relate to her work for GM. In addition, a government witness testified that Defendants' company, MTI, had already used trade secrets information in the GM files for another MTI project relating to hybrid motor technology. (See R. 202 at 96–116, 3785-3805; R. 203 at 3934-38.)

Emails, documents, and testimony also showed that—while Du was taking GM documents home with her—Defendants were putting together a joint venture to develop and manufacture hybrid motor control systems for Chery Automobile, and that they did not have the expertise or resources to do this without a head-start based on GM's technology. For instance, a

business plan drafted by Defendants' business partner in China explained that the joint venture aimed to "absorb the most advanced technologies in both China and the U.S." and specifically discussed GM's roll-out of a hybrid truck with similar motor technology. (Govt. Exhibits 76 & 77, R. 250-1 at 25–38, Page ID#5174–87.) He also drafted a white paper detailing the joint venture's plan to roll out commercial production of the motor technology over the course of three years (Govt. Exhibit 46.4, R. 250-1 at 9–10, Page ID# 5158–59)—an aggressive timeframe that the government's expert witness testified could not be met by the joint venture's small group of engineers alone (R. 204 at 135–41, Page ID#4089–95). The expert witness also testified that Qin and his Chinese partner lacked the qualifications to develop the motor control program for the technology, which was similar to GM motor control technology, despite differences in the motors' location. (*Id.*)

As to Qin's argument that he did not intend to convert the GM trade secrets because he could not have known the documents contained secret information, this is undermined by his experience as an engineer—experience that his own lawyer touted repeatedly at trial. *Cf. United States v. Krumrei*, 258 F.3d 535, 539 (6th Cir. 2001) (holding that a "defendant need not have been aware of the particular security measures taken" to secure trade secret information in order to meet the required knowledge "that the information was proprietary"). And while Du argues she was an innocent bystander to Qin's scheme, sufficient evidence existed of her involvement. The original business plan for the joint venture—drafted while she worked at GM—named her as one of three company officers. (*Id.* at 33–35.) In addition, the government showed evidence that she was involved in MTI's work and was its president during the time she took control of the GM information.

Ultimately, sufficient evidence supported Defendants' convictions on the theft of trade secrets charges.

## 2. Trade Secrets Conspiracy

As to conviction for conspiracy to steal trade secrets, Defendants raise the same intent argument as they do for the substantive conviction—that the government failed to show an underlying intent to convert trade secrets. (Du First Br. at 54; Qin First Br. at 51–52.) Du and Qin committed conspiracy to steal a trade secret if they intended to commit a violation of § 1832(a)(3) together and took a substantial step towards commission of the crime, regardless of whether the information obtained included trade secrets or if they completed the crime. 18 U.S.C. 1832(a)(5); *United States v. Yang*, 281 F.3d 534, 543–544 (6th Cir. 2002). Given the evidence outlined above, the government presented sufficient evidence to support this conviction, as well.

## 3. Wire Fraud

Qin next challenges the sufficiency of evidence supporting his conviction on three counts of wire fraud.

18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

"To convict a defendant of wire fraud, the government must prove '(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir.

2003) (quoting *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000)). Qin challenges the sufficiency of the government's evidence on all three elements.

### a. Scheme to Defraud

As to the first of these elements, "the defendant [must have] devised or willfully participated in a scheme to defraud." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010). "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* (quoting *Daniel*, 329 F.3d at 485). This requires "the government [to] prove that the defendant said something *materially* false" that "would have affected a reasonable person's actions in the situation." *Daniel*, 329 F.3d at 486–87; *accord Neder v. United States*, 527 U.S. 1, 16, 25 (1999).

Qin concedes that the government produced evidence that:

> (1) Du falsely certified to GM that she had returned all GM property when she signed her exit form containing that certification, (2) that Du falsely stated to a GM representative that she had deleted all GM documents, (3) that Du and Qin stated falsely that GM information had not been copied to any device other than the MTI hard drive, and (4) that Du and Qin falsely stated that they did not have GM documents in their possession at the time of the [2006 GM] interview.

(Qin Br. at 37.) Nonetheless, Qin argues that none of these false statements was material to the scheme because Defendants did not obtain the GM documents as a result of these statements—that is, the statements did not *cause* the theft of GM's property. (Qin First Br. at36–38.)

Qin's argument goes to an issue underlying all of his arguments challenging the wire fraud conviction: the scope of the scheme. Qin aims to frame this as a scheme only to steal GM's secrets. By contrast, the government's indictment more broadly defined the scheme as one to steal trade secrets, to exploit them, and conceal the unauthorized possession of the trade

secrets—extending the scheme to include Defendants' actions to set up a joint venture, to MTI's use of GM information, and Defendants' lies to GM, among other conduct. (Govt. Br. at 62-63; (Indictment, R. 3 at 3–4 ¶3, Page ID# 8–9.) *See United States v. Campbell*, 485 F. App'x 88, 91 (6th Cir. 2012) (recognizing that the "scheme as defined in the indictment" is controlling in determining whether sufficient evidence supported a conviction).

The law supports the government's articulation of the scheme here. This Court has stated that "a fraudulent scheme is not complete until the perpetrator has secured the benefits of the scheme." *Id.* (determining that a scheme to fraudulently obtain money orders extended to spending the funds illicitly obtained because the money orders would be "useless until they are used"); *see United States v. Cunningham*, 679 F.3d 355, 373–74 (6th Cir. 2012) (attorneys' fraudulent scheme to deprive clients of damages award was complete when the attorneys retained the funds). Similarly, in *Carpenter v. United States*, 484 U.S. 19, 28 (1987), the Supreme Court determined that a wire and mail fraud scheme involved not only obtaining confidential information relating to businesses but also "profiting from the information."

With the indictment's scope in mind, there is little dispute the statements were material. The thrust of the false statements was to deny and cover up Defendants' unauthorized possession of GM documents. This prevented GM from seizing its proprietary information from Defendants, either at the time Du left the company or when Defendants returned for the 2006 interview.

### b. Intent to defraud

As to the next element, a defendant must have made a misrepresentation with the specific intent "to deprive the victim of money or property." *Daniel*, 329 F.3d at 488. In other words, "the misrepresentation or omission must have the purpose of inducing the victim of the fraud to

part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Id.* at 487 (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).

Qin argues that the government failed to show proper intent for the false statements because Defendants made the statements to deceive GM of their actions, not to defraud it. (Qin First Br. at 35.) That is, they lied to cover their tracks and not to steal. Again, this ignores the actual scope of the scheme here, which included stealing property, exploiting it, and then covering their tracks.

The government produced substantial evidence from which the jury could have inferred Qin's intent to defraud GM. The thrust of the government's case was that Defendants needed and intended to use GM's trade secrets for their joint venture. While the joint venture's business plan was developing, Du downloaded thousands of GM documents and then lied to GM about possessing any of its documents at her termination.[4] The concealment continued well after Du left GM and when Qin was caught with the GM files, as both Defendants falsely told GM officials in 2006 that they had not copied GM files onto personal devices and that they no longer had any GM property in their possession. Based on these falsehoods and Qin's subsequent steps to shred GM-related files, a jury could infer Defendants made these false statements with the intent to hide the theft of the documents and Defendants' reliance on them.

---

[4] Qin argues he should not be held accountable for Du's misrepresentations because "Du was acquitted of wire fraud, which means she has been acquitted of making any false representation." **(Qin First Br. at 40.)** This is unfounded speculation. The jury did not specify such a finding in its general verdict. An equally likely scenario is that jury found Du made false representations, but did not send any wire communications in furtherance of the scheme—a conclusion borne out by the fact that she was not on any of the emails that formed the basis of this claim.

### c. *Wire Communications Made in Furtherance of Scheme*

Finally, the wire fraud statute requires that a wire communication be employed "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. A wire communication "need not be an essential element of the scheme," but only "'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (internal citations omitted). In other words, "the communication must be sufficiently related to the scheme, which is to say that 'the scheme's completion or the prevention of its detection must have depended in some way on the charged [communication].'" *Daniel*, 329 F.3d at 489 (quoting *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986)).

Here, the government identified a chain of three emails between Qin and others regarding the joint venture that served as the basis of the indictment and conviction. (See Exhibits 136.1 to 136.3, R. 250-1 at 47–56, Page ID#5196–5205; Indictment, R. 3 at 13–14.) In the emails, Qin introduces team members and assigns them responsibilities and tasks; one of his partners also suggests potential investors and outlines the company's white paper to present to Chery. Together, these are sufficient evidence that Qin engaged in wire communications to set up the joint venture that would allow him to sell hybrid motor technology to Chery and to profit from GM's trade secrets.

Qin's only response is to offer a handful of patently erroneous arguments—that the emails needed to contain fraudulent statements made for the purpose of defrauding GM (Qin First Br. at 39), *see e.g.*, *Schmuck*, 489 U.S. at 714–15 (a wire communication does not need to contain false information and can be a routine communication), and that the emails had to be necessary to the scheme (Qin Third Br. at 19), *see id.* at 710–11 ("It is sufficient for the

[communication] to be 'incident to an essential part of the scheme."). These are unconvincing. As a result, his challenge to the wire fraud convictions fails.

### 4. Obstruction of Justice

Finally, Qin challenges the sufficiency of the evidence supporting his obstruction of justice conviction. Under 18 U.S.C. § 1512(c)(1), "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both."

Here, FBI agents testified that a surveillance team watched Qin attempt to dispose of two garbage bags full of shredded documents after agents executed a search warrant on Defendants' home and served Defendants with two grand jury subpoenas for their business records. (R. 194 at 89–106, Page ID#2687–2704; R. 195 at 77–83, Page ID#2784-90; R. 199.) The agents retrieved the bags from a grocery store dumpster and had the documents reconstructed.

While Qin concedes that these acts occurred, he argues that the government did not show requisite intent that Qin was trying to obstruct a grand jury proceeding. First, he argues that the documents were personal, rather than the specific business records sought by the subpoena. (Qin First Br. at 52–53.) This was directly contradicted by the government's evidence. One agent who reviewed the retrieved documents testified that they related to Defendants' businesses and included documents specified by the subpoenas. (R. 205 at 98–101.) Qin also argues that there was an innocent reason for the disposal—his belief that it would be best to rid himself of the documents given civil litigation with his former employer, Controlled Power. Again, however, the government presented evidence of the contrary—namely the timing and circumstances of Qin's actions—from which the jury could infer Qin's intent was to "impair" the documents' use

in the criminal proceeding. Thus, the obstruction of justice conviction was supported by sufficient evidence.

### D. Prosecutorial Misconduct

Next, Defendants argue that the district court erred in denying their motion for new trial based on prosecutorial misconduct.

Whether statements made by the prosecutor constitute prosecutorial misconduct presents a mixed question of law and fact that this Court reviews de novo. *United States v. Tarwater*, 308 F.3d 494, 510–11 (6th Cir. 2002) (citations omitted). "When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper. If they appear improper, we then look to see if they were flagrant and warrant reversal." *Id.* at 511 (citations omitted).

Du argues that the prosecutor improperly stated in opening and closing arguments that the documents underlying the trade secrets counts "did not all relate to [Du's] work," though the prosecutor knew from pre-trial interviews and materials that some of the documents were, in fact, relevant to Du's work for GM. This argument is spurious. The fact that evidence existed that some of the documents may have related to Du's work in no way makes the prosecutor's statements false. Rather, the prosecutor implicitly acknowledged that some documents may have been relevant when she stated that "some of the information" and "not all" of the documents related to Du's work.

For his part, Qin argues that the prosecutorial misconduct is based on the government's deliberate decision not to call as a witness one of Du's supervisors who told pre-trial investigators that some of the files related to Du's work. (Qin Third Br. at 35–36.) Qin likens this case to the misconduct in *United States v. Reyes*, 577 F.3d 1069, 1076–77 (9th Cir. 2009), a

*United States v. Du, Qin*, Case Nos. 13-1606/ 1607/ 1778/ 1781

corporate-fraud case in which the prosecutor made a patently false statement in closing that he

knew was contradicted by evidence not presented to the jury. But, as with Du, Qin misses the

point that the prosecutor's statements here were tempered—she didn't state, for example, that

*none* of the documents related to Du's work at GM. The prosecutor did not have a duty to call

all possible witnesses for their opinions; she had a duty to present a nuanced proof that did not

overstep the truth of the facts and evidence in her case. Her conduct met that mark.

### E. Jury Instructions

Finally, Defendants argue that the district court erred in rejecting a requested instruction

about the required intent for the conspiracy to possess unauthorized trade secrets. This Court

reviews the denial of a proposed jury instruction for abuse of discretion. *United States v. Hart*,

635 F.3d 850, 854 (6th Cir. 2011).

The trade secrets statute provides:

> Whoever, with intent to convert a trade secret, . . . knowingly — conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy, shall . . . be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1832(a)(5). A conviction of conspiracy to possess trade secrets without

authorization under 18 U.S.C. § 1832(a)(5) requires the same intent to convert as the substantive

underlying offense. *See United States v. Feola*, 420 U.S. 671, 686–96 (1975).

Before trial, Defendants requested an instruction on the conspiracy charge that included a

distinct statement that Defendants must have intended to convert a trade secret to be convicted of

the conspiracy. The government opposed this instruction, on the ground that it was duplicative

of the charge in the substantive offense, and requested the court base the conspiracy instruction

on this Circuit's Criminal Pattern Jury Instruction 3.01A. (R. 191 at 10–15, Page ID#2350–55.)

The district court rejected Defendants' request (*id.* at 15), but adopted a slightly modified version of the pattern instruction that added an additional reference to the substantive charge. It instructed that the first element of conspiracy is "that two or more persons conspired, or agreed, to commit the crime of possession of trade secrets without authorization *as defined in these instructions*." (R. 207 at 16, Page ID#4424). It also instructed the jury that "the Government must prove that he knew, or she knew, the conspiracy's main purpose and that he or she voluntarily joined it intending to help advance or achieve its goals." (*Id.* at 17–18.)

The district court's instructions sufficed. All of the parties agree that the required intent is the same for both the conspiracy and substantive offenses, and the court's conspiracy instructions explicitly referenced the substantive charges, which followed immediately after the conspiracy charge. The court's modification—"as defined in these instructions"—essentially tipped off the jury to read the two charges together. Based on this language, it is difficult to say that the intent element was missing. Even if this were an error, however, the error would be harmless given that the jury also convicted both Defendants of the substantive possession charges, which required the same finding of intent to convert.

### *F. Sentencing*

The government cross-appeals on sentencing, arguing that Defendants' sentences were substantively unreasonable because the district court considered impermissible factors in granting a downward variance to both Defendants.

This Court reviews Defendants' sentences for reasonableness under an abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 56 (2007). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an

unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). If the district court "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. However, the reviewing court must be careful not "to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable"; it must give significant deference to a district court's "reasoned and reasonable decision." *Id.* at 59–60.

Defendants both had a Guidelines range of seventy-eight to ninety-seven months. At the conclusion of a two-day hearing, the district court sentenced Qin to thirty-six months' incarceration and Du to twelve months and one day of imprisonment. The district court gave a thorough, informed, and empathetic explanation for its decision that addressed each of the sentencing factors listed in 18 U.S.C. § 3553(a).

On appeal, the government argues that the district court considered two inappropriate factors in granting the variances: delay in the prosecution, *see United States v. Davis*, 537 F.3d 611 (6th Cir. 2008), and collateral consequences of the prosecution, *see United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013); *United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012). However, a district court's potential error in considering an impermissible factor for a downward variance "constitutes an abuse of discretion only if [. . .] other reasons do not independently explain the district court's decision to vary downward." *United States v. Stall*, 581 F.3d 276, 289 (6th Cir. 2009).

Here, even if the district court did consider inappropriate factors—and we do not conclude that it did—the sentencing judge relied sufficiently on permissible factors to support the downward variances for Qin and Du. The district court cited multiple reasons that

contributed to the variances: the unlikelihood of recidivism, their personal family circumstances, their families' history of persecution in China, their education, and likelihood of rehabilitation, among others.

It is worth noting that the government takes issue with the district court's consideration of Du's deteriorating mental health over the course of the litigation, which the government labels a "collateral consequence" of the prosecution. The government's position is at odds with both the Guidelines and common sense. The Guidelines explicitly allow the district court to take into consideration a defendant's mental and emotional state at the time of sentencing. U.S.S.G. §5H1.3. In addition, the government ignores the reality that a person's mental condition may change over time. This is particularly true if, as apparently was the case with Du, a defendant suffers from an underlying mental condition that existed before she endured a multi-year federal prosecution. It likely would have been impossible for the district court to consider Du's mental condition at sentencing without considering the impact of the prosecution. In this way, mental health is simply a different beast than the more static, punishment-like collateral consequences in the cases cited by the government. *See, e.g.*, *Bistline*, 665 F.3d at 765–66 (rejecting consideration of the collateral consequence of humiliation of placement on a sex offender registry). We cannot conclude the district court abused its discretion in granting the downward variances.

## IV. Conclusion

For the reasons stated above, we AFFIRM Defendants' convictions and sentences.